(No. 34343.—

THE PEOPLE OF THE STATE OF ILLINOIS, Defendant in Error, *vs.* CELIA WIGGINS, Plaintiff in Error.

*Opinion filed Nov. 20, 1957—Rehearing denied Jan. 20, 1958.*

CHARLES B. EVINS, and R. EUGENE PINCHAM, both of Chicago, for plaintiff in error.

LATHAM CASTLE, Attorney General, of Springfield, and BENJAMIN S. ADAMOWSKI, State's Attorney, of Chicago, (FRED G. LEACH, BRUCE E. KAUFMAN, L. LOUIS KARTON, and WILLIAM L. CARLIN, of counsel,) for the People.

Mr. JUSTICE BRISTOW delivered the opinion of the court:

Defendant, Celia Wiggins, is seeking a review of the judgment of the criminal court of Cook County entered in a trial without a jury finding defendant guilty of involuntary manslaughter, and sentencing her to a term of one to seven years in the State Reformatory for Women. Inasmuch as defendant contends that the evidence fails to establish beyond a reasonable doubt that she was guilty of the crime of involuntary manslaughter, but rather indicates that the homicide was committed in self-defense, it is incumbent upon this court to review the record.

It appears that defendant, Celia Wiggins, age 27, lived with her "boy friend," Andrew Collins, the deceased, as man and wife. Her daughter, age 7, also resided with them. The whereabouts of defendant's husband is unknown, and the record is not clear as to the nature of defendant's occupation, if any. With reference to the sequence of events on the night of the homicide, defendant testified that at about 8:30 or 9:00 P.M. on July 16, 1955, she saw deceased, Andrew Collins, at Bud Wolf's tavern and he told her that he had taken her daughter to the movies and would pick up the child later. The record is controverted as to defendant's activities during the ensuing hours. She testified first that she went home, bathed, listened to the radio and records, but when asked whether she was on Division Street that night, she stated that she went out again

and was walking and talking with diverse persons, whom she could not identify, and visited several taverns at which she had some drinks in the vicinity of Division and Wells streets. After following her own devices for several hours, defendant returned to Wolf's tavern, at about 1:30 A.M., and then went to the home of Mathis Davis, known as Milton, where she found Collins and her child visiting on the back porch. According to Milton's testimony, defendant used foul language and swore at Collins, and then the three of them left together.

Defendant, however, claims that she and Collins quarreled about keeping the child out so late, and that she left alone and went back to the tavern, apparently as a short cut to her car, but while walking through the tavern she was told to talk to Collins about his conduct earlier that evening, when he had annoyed a woman by brandishing a gun. Defendant then returned to the Davis home, took the gun out of Collins's pocket, questioned him about the woman, and left with her daughter. Defendant claims further that she gave the gun back to Collins when he tried to keep the child from going with her. Milton, however, denied that there had been any conversation about a gun or about Collins drawing it on a woman in the tavern.

On her way to her car a second time, defendant met Janis Marie, a friend, and they had a conversation. Upon discovering that her daughter was playing with Collins' car keys, defendant returned again to the Davis house; however, she did not go through the tavern this time. She called to Collins from the alley, "It's me, baby, I came to bring you your car keys." She claims that he stood on the back porch pointing the gun at her and threatened to shoot her. She ran back to Bud Wolf's tavern and the latter gave her a dime to call the police. She claims she telephoned the police three times that night, but apparently did not tell them who or where she was, but merely said that she was afraid of a man with a gun in the alley in the 1600 block

between Kedzie and Sawyer. The police did not come to investigate, as far as she knew.

Defendant and Janis then drove to the home of Janis's mother, where they left defendant's daughter. Defendant claims she then asked Janis and her husband, B. B. Donaldson, to go home with her, because she was afraid of Collins. They first drove to a police station, apparently to find out if Collins had been picked up, or to get help; however, when told it was the wrong police station, defendant made no mention of Collins's behavior, or her fears. They could not find the right station, and drove at about 65-70 miles an hour to attract the police, but were not followed.

When they reached defendant's apartment they found Collins asleep. "B. B." testified that he woke Collins, who became angry when Donaldson told him that he wanted to talk about the trouble at the tavern that evening. They fought and Donaldson was cut on the hand as they struggled for a knife, which "B. B." said he took from Collins.

Janis and "B. B." left at about 4:00 A.M., and according to defendant's testimony, she and Collins continued quarreling, mostly about his gun, which he accused her of keeping, and also about Bud Wolf. Defendant claims that Collins threatened to kill her if she didn't get the gun, so she took it from its regular place in the china cabinet drawer. She walked around the room, arguing, and at one point he allegedly threw a fruit dish at her, but didn't hit her. Later, they both reached for the gun, which was on the cabinet, but she got it, and according to her testimony, Collins then reached for a knife, which was also on the cabinet, and said, "If you don't kill me, I'm going to kill you." She then shot him three times. However, at the coroner's inquest, the day after the homicide, defendant made no mention of any knife, but merely said that deceased was reaching for something on the stove and while she didn't know what it was, it was just more than she could take, and she shot him. She specifically stated at that time that deceased

did not strike her, and that he did not have a knife in his hand when she shot him. When asked if she thought he was going to kill her, defendant said that she didn't know, but was scared.

After she fired the shots, according to her testimony, she picked up the knife and the telephone, but when she heard Collins still breathing, she dropped the phone and ran out of the apartment. The shooting took place at 5:00 A.M., and at 8:00 A.M. defendant and her father appeared at the police station. Defendant handed the gun to the policeman at the desk and told him that she had just shot her boy friend. A police officer then accompanied defendant and her father back to the apartment which they had to break into since defendant had left her keys inside. They found the apartment in disorder, with some broken glass on the floor and with deceased lying dead on the kitchen floor near the stove with three bullet wounds in his body, and three discharged shells nearby.

The prosecution also adduced testimony that defendant had threatened to kill deceased some two months before, in a telephone conversation with a Mrs. Lee, for whom deceased worked. The witness Mathis Davis (Milton) also testified that he saw defendant waving the gun around at the tavern and carrying it on her person about two months before.

On the basis of the foregoing evidence the trial court found that the defendant was guilty of involuntary manslaughter, and sentenced her to the State Reformatory for Women for one to seven years. Motions for a new trial, in arrest of judgment and for probation were overruled. After some 17 orders for stays of mittimus and numerous extensions of time for filing the bill of exceptions the cause was finally presented to this court for review by writ of error.

In determining whether the evidence established that defendant was guilty of involuntary manslaughter beyond

a reasonable doubt, it is clear that after the prosecution established that defendant killed the deceased, which it did by the testimony of officer Morton Kruse that defendant came to the station at 5:00 A.M., turned over the gun, and said that she had just killed her boy friend, the burden of reducing the crime from murder to manslaughter, or to justifiable homicide devolved upon the accused. *People* v. *Tripp,* 392 Ill. 351; *People* v. *Brindley,* 369 Ill. 486; *People* v. *Franklin,* 390 Ill. 108, 111.

In the *Franklin case* the court stated at page 111: "It being undisputed on this record that the deceased was killed by a shot from a gun in the hands of plaintiff in error, the burden was upon him to prove circumstances mitigating, justifying or excusing his acts, unless it was sufficiently manifest from the proof on the part of the prosecution that he was justified or excused in committing the homicide."

In the instant case the prosecution's proof showed no such justification; consequently, it was incumbent upon defendant to prove circumstances mitigating or justifying her conduct, and she endeavored to do so by testifying and introducing evidence that the killing was in self-defense. The essential elements of this defense are set forth in the Criminal Code (Ill. Rev. Stat. 1957, chap. 38, par. 367,) which provides: "If a person kill another in self-defense, it must appear that the danger was so urgent and pressing that in order to save his own life, or to prevent his receiving great bodily harm, the killing of the other was absolutely necessary; and it must appear *also,* that the person killed was the assailant, or that the slayer had really, and in good faith, endeavored to decline any further struggle before the mortal blow was given." (Italics added.)

In the case at bar defendant was the only person who could testify as to what exactly transpired at the time of the shooting. However, the court was not compelled to accept her account as conclusive, but would properly consider the surrounding circumstances and the probability or

improbability of her story. (*People v. Uher,* 375 Ill. 499; *People v. Jordan,* 4 Ill.2d 155, 163; *People v. Strause,* 290 Ill. 259.) In the *Uher case* the court stated that "where a defendant is the only person to testify as to the actual facts of the homicide with which he is charged, the jury is not compelled to accept his statements but may consider the surrounding circumstances and, also the probability or the improbability of his narration."

It is apparent from the record that defendant's protest of fear for her life from deceased was not entirely consistent with her conduct. Her account of her efforts to contact the police are dubious at best, for if she had been concerned about her safety she certainly would have told the police exactly where Collins was, or given them her own whereabouts, or the address of their apartment when she allegedly telephoned them three times; or she might have told her story to the police at the station where she and the Donaldsons allegedly stopped, instead of seeking police protection by driving at 65 miles an hour.

Further doubt on the legitimacy of her fears is cast by her persisting in the argument with Collins for over an hour after the Donaldsons left their apartment—assuming that the Donaldsons were there in the first place—for there is no suggestion that defendant at any time was restrained by Collins from leaving or even from going to bed. Moreover, there is no evidence that Collins held the gun on defendant at any time, for it had been lying on the cabinet when she reached for it. Nor it is clear what Collins did with the gun that was supposed to have been in his possession earlier in the evening, or why he made defendant find the gun if it was in its regular place, as defendant testified. Nor is there any evidence that Collins struck defendant, or even approached her menacingly with or without any weapon until after she grabbed the gun.

Defendant's story of deceased's threatening her with a knife is contradicted both by her statement at the coroner's

inquest, and by the circumstances. At the inquest, defendant stated unequivocally that Collins did not have a knife when she shot him, but had merely reached for something, "she didn't know what," on the stove when she pointed the gun at him. Furthermore, since "B. B." Donaldson was supposed to have wrested the knife from deceased when they quarreled, it is not clear just how deceased could have picked up the same weapon from the same place, for it is unlikely that "B. B." would have either returned it to deceased, or put it back on the cabinet again. Finally, defendant's statement that she picked up the knife from the floor right after she shot Collins and just before she ran away does not have the ring of truth, but rather appears to be an attempt to account for why the knife was not found on the floor or in decedent's hand where it would have been if he had held it to threaten her, as she claims.

All of the foregoing circumstances, together with defendant's threats to kill deceased were properly considered by the trial court in determining the credence to be given defendant's story of self-defense, and substantiated the findings of the trial court that defendant did not show that the danger to her person was so urgent and pressing that she had to shoot deceased three times, in order to save herself, or that defendant in good faith endeavored to decline any struggle before the mortal blow was given, as required under the statutory definition of self-defense.

Where the cause is tried without a jury, as in the instant case, it is the province of the trial judge, who heard and saw the witnesses and had the opportunity to observe their conduct and demeanor while testifying, to determine the credibility of witnesses, and to weigh their testimony, and a reviewing court should not substitute its judgment for that of the trial court where the evidence and the inferences therefrom are merely conflicting. *People* v. *Sain,* 384 Ill. 394; *People* v. *Franklin,* 390 Ill. 108.

In the *Franklin case,* as in the instant case, the trial

court was of the opinion that the circumstances appearing from defendant's testimony were not sufficient to justify or excuse the killing, but were sufficient to reduce the crime to manslaughter, and the court stated at page 111: "The trial court saw and heard the witness testify and was in a position to judge the weight of his testimony. In such circumstances the finding of the trial court will not be disturbed."

Similarly, in *People* v. *Sain,* 384 Ill. 394, the court, in rejecting the contention that the finding of manslaughter should not stand since defendant was either guilty of murder or nothing at all, stated at page 399: "It was the province of the trial judge, a jury having been waived, to settle the conflict in the evidence and determine from the facts and circumstances whether defendant acted in self-defense, or, if not in self-defense whether the circumstances attending the assault were such that her death at defendant's hands constituted murder, manslaughter or justifiable homicide."

This approach is entirely proper, for the crime of manslaughter is embraced in the charge of murder, and under an indictment for murder, where a homicide is proved, but proof of the requisite element of malice is lacking, a conviction for manslaughter is proper. *People* v. *Crawford,* 387 Ill. 616, 620; *People* v. *Carrico,* 310 Ill. 543, 546.

In the instant case defendant repeatedly stated that she did not intend to kill or harm deceased; consequently, the finding of the trial court that the requisite element of malice was lacking, and that the killing, without intent to do so, in the course of an unlawful act, constituted involuntary manslaughter was substantiated by the record and was in accordance with the definition of the crime in the Criminal Code. Ill. Rev. Stat. 1957, chap. 38, par. 363.

Therefore, on the basis of our review of the record, we find that it establishes beyond a reasonable doubt that defendant was guilty of the crime of involuntary man-

slaughter, as determined by the trial court, and its judgment was in accordance with law and is affirmed.

*Judgment affirmed.*