STATE FARM LIFE INSURANCE COMPANY, Plaintiff-Appellee, *v.* ROSA MAE SMITH *et al.*, Defendants—(ROSA MAE SMITH, Appellant; EVERLEAN SMITH *et al.*, Appellees.).

(No. 58980;

First District (1st Division)—June 2, 1975.

James D. Montgomery and Watt & Holland, both of Chicago, for appellant.

Howard R. Slater, of Chicago, for appellee Everlean Smith.

John A. Doyle, of Chicago, for appellees Yvette Smith and Ronald C. Smith.

Mr. JUSTICE EGAN delivered the opinion of the court:

The interpleader, State Farm Life Insurance Company, issued two life insurance policies totaling $92,422.50 on the life of Jesse Smith. His wife, Rosa Mae Smith (hereafter the defendant), was the primary beneficiary on both policies and their daughter, Yvette Smith and his mother, Everlean Smith, were the contingent beneficiaries on one in the sum of $87,422.50. Jesse Smith died on August 24, 1970, as a result of bullet wounds inflicted by the defendant on July 20, 1970. She later assigned part of her interest in the insurance proceeds to her lawyer, James D. Montgomery. She was charged with murder, but the Grand Jury voted a no bill. State Farm deposited the proceeds with the court, which after a hearing ruled that the defendant had intentionally killed her husband

and consequently was not entitled to any insurance proceeds. The court awarded the proceeds of one policy to Yvette Smith and Everlean Smith and of the other to the estate of Jesse Smith.

The defendant first contends that the evidence was insufficient to support the trial court's finding. Since this case hinges on the credibility of the witnesses, it is necessary to summarize their testimony. The defendant testified that she married the deceased in 1964. They had separated intermittently for six months, and she had left him about a month before the shooting. On the morning of July 20, 1970, she left her mother's home for work and while driving was forced to stop by her husband, who was also driving. He entered her car from the driver's side. They sat talking for approximately three hours. He wanted her to come back home but she refused. Each time she refused, he struck her. At times she tried to leave the car from the passenger side, but he grabbed her by the arm and told her that he would not let her get out. They continued talking until she suggested that they get something to eat. While driving to a McDonald's restaurant he never let go of her arm. She testified: "We entered McDonald's and made our purchases." After leaving McDonald's he agreed to take her to work. While driving toward her place of employment, he told her that he had to go home for something. She grabbed the steering wheel whereupon he hit her in the mouth. When the car slowed down for a turn, she swung the door open and tried to jump out, but he was holding her arm. As she came out of the car, he slid out behind her. He beat her about the body, knocked her down and kicked her. She tried to get away by attempting to crawl under the car but he pulled her out from under the car, picked her up by her clothes and struck her head against the roof of the car. He threw her into the back seat of the two-door automobile and drove off; at the same time he kept reaching into the back seat striking her in an attempt to keep her subdued. He told her to stay down or he would kill her. She saw the gun she had in her purse slide back from the front seat. She picked up the gun and fired it, striking him in the head. He turned and grabbed her around the throat with both hands. She fired a second shot, threw the gun on the back seat of the car, pushed the front seat forward and got out of the car. As she left, the car was still in motion and she fell when she got out. She ran to her cousin's apartment where she called the police.

The gun was her husband's and she had placed it in her purse the day before the shooting. She had seen him the day before the shooting as she came out of her mother's house accompanied by her father. An argument arose between her and her husband, and he struck her. It was sometime after this incident that she placed the gun in her purse.

While in police custody the day of the shooting, she was sore all over her body and noticed fingernail marks or handprints on her throat. Her skirt and blouse were dirty and she noticed that the collar on her blouse was torn when the police were taking her picture. She denied telling one of the police officers that she put the gun in her purse that morning because she was tired of him "messing on her." She also testified that she had blood in her mouth, which was swollen, and that Jesse had struck her at least eight times during the initial three-hour conversation that morning.

James Allen testified on behalf of the defendant that he was on the southeast corner of Kostner and Washington on July 20 and that he saw a man he later identified as Jesse Smith leave a car, come around to the passenger side and pull a woman out of the car. The man struck the woman in the head with his fists or hands, knocking her down a couple of times. The woman, he later identified as the defendant, tried to get away by crawling under the car but was pulled back out by the man who started bouncing her head on the car. The man then threw her into the back of the car and drove off. Allen continued cleaning some bricks which he was taking from a razed building until he heard police sirens. He got into his car and followed a police car to see what happened. At the scene of the shooting, he recognized the man in the ambulance as the man who had beaten the woman. He spoke to an officer at the scene who told him to go to the Damen Avenue Police Station. He went to the hospital and spoke to a policeman.

The defendant's sister testified she observed bruises on the defendant's shoulder and arm and scratch marks on her neck. She also saw that the defendant's blouse was torn. The next day she took the defendant to the hospital where the defendant received medication to calm her down.

Officer Richard Hoffman testified on behalf of the contingent beneficiaries that he and his partner, Officer Raymond Adams, arrested the defendant approximately one-half hour after they first arrived at the scene of the shooting. He found the gun on the back seat of the vehicle along with a purse and shopping bag. The defendant was crying and approaching hysteria but calmed down somewhat after they left the hospital. At the station she said that she met her husband on her way to work and spent most of the morning talking about their marriage. She did not give any reasons for the shooting. Hoffman did not see any marks or bruises on her nor did he see James Allen at the scene.

Officer Raymond Adams testified that the vehicle that Jesse Smith had been driving left skidmarks of 6 to 10 feet. While Officer Hoffman and others were coming in and going out, he questioned the defendant, who told him: "It's his gun. I took it with me this morning because I was sick

of him messing on me." He noticed no rips or tears in her clothing and saw no dirt on her blouse other than some dirt around the cuffs. He saw her wipe her face and eyes with the cuffs on her blouse but did not see any black eyes, bruises, markings or bleeding. He was present when the defendant told an investigator that she was beaten by her husband before the shooting. He saw what appeared to be make-up on her sleeves, her shoulder and possibly on her shirt tail and saw her wipe her nose, eyes and face with her blouse while in the office being questioned.

George Stewart testified for the contingent beneficiaries that he was in Gloria Richards' apartment near the scene of the shooting when he heard a shot. He saw a car going down the street with a man in the driver's seat leaning over the steering wheel. The car struck a parked car. He went down the stairs where he saw a woman backing out of the right-hand car door with a gun in her hand. He heard a second shot as he saw the woman backing out. She had come from the back seat of the car. She then threw the gun in the back of the car and ran down the street. When the police arrived, he did not tell them what he had seen. His friend, Gloria Richards, received a subpoena for a criminal matter involving the shooting, and he decided to go with her to tell what he had seen. Before his decision to relate what he had seen in the criminal proceedings, he was visited by Thomas Smith, the brother of the deceased. Thomas Smith told him that Jesse had died some 4 or 5 weeks after the shooting and asked if he knew anybody in the area who had observed it. Stewart said that he had seen what happened but that he wanted nothing to do with it. It was sometime after this discussion that Stewart decided to go with Gloria Richards, who had been subpoenaed. He said he felt sympathetic toward Thomas Smith because his brother had died.

Investigator John Leonard testified that the defendant told him that she had possession of the gun for approximately four months before the shooting. He did not recall seeing any marks or bruises on her at the time he questioned her. She said Jesse told her he was going to drive her to work but later refused; and that Jesse got out of the car and beat her when she attempted to leave. He talked to a Mr. James Allen who came to the 15th District Station as a witness to some part of the incident and reported the substance of what Allen had said.

The defendant has cited a number of cases dealing with the general law of self-defense, and she relies principally on *People v. McGraw*, 13 Ill.2d 249, 149 N.E.2d 100. In *McGraw*, a police officer, who was armed, was involved in a minor traffic collision with the unarmed defendant. The police officer struck the defendant a number of times and later put his gun in his car where the defendant retrieved it. The police officer

started toward the defendant, who fired several shots, killing him. The Supreme Court reversed the murder conviction stating (13 Ill.2d at 253):

> "There is no question but that the deceased was the aggressor. All eyewitnesses, both for the prosecution and the defense, testified without exception that Roushorn struck all the blows, that the defendant offered no resistance at any time and that his first aggressive act was the procurement of the gun."

The quoted language from *McGraw* pinpoints the issue in this case: Is there any question "but that the deceased was the aggressor"? Put another way, could the factfinder have concluded that the defendant did not reasonably believe that the shooting was necessary to prevent death or great bodily harm? If the trial court was bound to accept the defendant's version as true, then the defendant's contention is correct. But the law is clear that the judge was not compelled to accept the accounts of the defendant or her witnesses but could properly consider the surrounding circumstances and the probability or improbability of their stories. *People v. Young*, 11 Ill.App.3d 609, 615, 297 N.E.2d 298, citing *People v. Wiggins*, 12 Ill.2d 418, 147 N.E.2d 80.

■■  At this juncture, since the parties disagree on the application of the term, we deem it appropriate to discuss the "burden of proof." The phrase has been used to mean either the necessity of establishing a fact, that is, the burden of persuasion, or the necessity of making a prima facie showing, that is, the burden of going forward. (See McCormick on Evidence § 336 (2d ed. 1972).) The pleadings established that Jesse Smith was dead and that the defendant was the named beneficiary. That being so, the trial court correctly ruled that the contingent beneficiaries had the burden of going forward and also the burden of proving that Rosa Mae Smith was barred from recovery. One claiming the proceeds of a life insurance policy as against the named beneficiary has the burden of establishing his claim. (44 Am. Jur. 2d Insurance § 1977; *Minnesota Mutual Life Ins. Co. v. James*, 202 F.Supp. 243.) Once the contingent beneficiaries established that the defendant had killed the deceased, the burden was then on her to "go forward" with the introduction of some evidence showing circumstances justifying or excusing her acts, unless it was sufficiently manifest from the proof on the part of the contingent beneficiaries that she was justified or excused in committing the homicide. But once evidence of self-defense was interposed, whether by the contingent beneficiaries or the defendant, the overall burden of persuasion was placed on the contingent beneficiaries to show that it was more probably true than not true that the defendant did not act in self-defense. Cf. *People v. Warren*, 33 Ill.2d 168, 173, 210 N.E.2d 507.

According to her testimony, she was, in effect, held captive for over three hours by her husband, who weighed approximately 260 pounds and who struck her over eight times. Yet she made no outcry to the postman she knew and who had greeted her nor to the counterman at McDonald's where she and her husband "made their purchases."

According to her testimony, she fired two shots in all; and after the first one, the deceased turned around and began choking her with both hands. One of the bullets lodged in the deceased's brain. There were three bullet wounds: one about two inches above his right ear; another one inch to the right of and one inch above the right eye; and another at the center of the forehead. Whether they were wounds of entry or exit could not be determined by Investigator Leonard. One of them must have been an exit wound. But, in any event, it is inescapable that the first shot caused one of them; and it is difficult to believe that a man who suffered any of the wounds described would be able to turn and begin choking her.

She testified that the gun was in a drawstring purse which was closed and under the front seat and that the gun somehow *slid* out of the purse and across a rubber mat. She had testified in her deposition that the gun slid backward when the deceased stopped for a redlight—a fact which defies certain physical laws. In addition, Officer Leonard testified that she told him she pulled the gun out of her purse. She testified that she could have told him that. Her testimony and that of her sister that she had been bruised and her clothes torn and soiled is refuted not only by the officers' testimony, but by the pictures in evidence which were taken by the police that evening.

The defendant and her witness Allen contradicted each other on some matters; and, although it may be argued that they were relatively minor, it was for the trial judge to weigh them. She said the deceased slid across the front seat; Allen said he got out of the car and walked around to the passenger side. She said the deceased kicked her; Allen said he did not recall the deceased kicking her. She said the car was parked in the street; Allen said it was at the curb. She said there were eight people waiting for a bus a few feet west of her; Allen said the only people around were three or four house painters at a building 200 feet east of the bus stop.

■■ In addition to the improbabilities in her own testimony and the contradictions between her and Allen, the trial court heard the testimony of Stewart, so damaging to the defendant. He said that the vehicle was in motion with the driver slumped forward over the wheel when he saw the defendant fire the second shot as she was backing out of the car. Under all the evidence, therefore, the trial court, who was the judge of the credibility of the witnesses, could properly conclude that the kill-

ing was willful and intentional and at the time she fired the gun the defendant did not reasonably believe that she was in danger of suffering death or great bodily harm.

■■ The defendant contends that the trial court committed prejudicial error in denying the admission of evidence that the Grand Jury voted a no bill in the criminal proceedings against the defendant. There are two reasons for rejecting the defendant's argument: First, it has been consistently held that acquittal in a criminal proceeding is not a bar to prosecution of a civil action arising out of the same acts or transactions. (*People v. Kapande*, 23 Ill.2d 230, 177 N.E.2d 825; *White v. Youngblood*, 367 Ill. 632, 12 N.E.2d 650; *People v. Small*, 319 Ill. 437, 150 N.E. 435.) Second, no evidence of a no bill was offered at the trial. The defendant had previously filed a motion for summary judgment, which was denied by Judge Dahl and, although the record does not contain the exhibits or affidavits which allegedly were attached, it is conceded by the contingent beneficiaries that one of the exhibits which was attached was a "determination by a Grand Jury that no true bill lies." We know of no authority for the proposition that all matters heard on a motion for a summary judgment must be considered later by the trial factfinder. If a jury heard the case, the untenability of such a proposition would be obvious. There is no reason for a different rule where the jury is waived.

The Probate Act provides that one convicted of murder may not inherit nor receive a devise or legacy from the murdered person. (Ill. Rev. Stat. 1971, ch. 3, §§ 15a, 49a.) In *Bradley v. Fox*, 7 Ill.2d 106, 129 N.E.2d 699, the Supreme Court held that one joint tenant could not murder the other and thus create a survivorship right. The court overruled the case of *Welsh v. James*, 408 Ill. 18, 95 N.E.2d 872, and in so doing pointed out that the provisions of the Probate Act involved here had been enacted after *Welsh*. The defendant now contends that the Supreme Court was saying that the Probate Act represents the public policy of Illinois and, therefore, a "conviction" of murder is a condition precedent to the defeasance of the defendant's rights under the policy. There are a number of reasons why the defendant's argument must be rejected.

■■ First, the supposition that the word "conviction" as used in the Probate Act means a conviction in a criminal proceeding, implicit in the defendant's argument, is ill-founded. "Conviction" is not necessarily restricted to criminal prosecutions, but in its most extensive sense the term signifies the giving of judgment against the defendant, and will apply to a civil as well as to a criminal action. (18 C.J.S. *Conviction* 98 (1939); *Eddy v. Dodson*, 242 Ill.App. 508, 514-515; *Egan v. Jone* (1893), 21 Nev. 433, 435, 32 P. 929; *Slothower v. Dayton Power & Light Co.* (Ohio App. 1956), 75 Ohio L. Abs. 313, 144 N.E.2d 219; *South Carolina*

*State Highway Department v. Southern Ry. Co.* (1961), 239 S.C. 227, 122 S.E.2d 422; *Blair v. Commonwealth* (1874), 66 Va. (25 Gratt.) 850.) In the following cases the rights of the killer or his heirs were barred although there had not been a criminal conviction: *Illinois Bankers Life Ass'n. v. Collins,* 341 Ill. 548, 173 N.E. 465; *In re King's Estate* (1952), 261 Wis. 266, 52 N.W.2d 885 (in both cases the husband murdered his wife and immediately committed suicide); *Goldsmith v. Pearce,* 345 Mich. 146, 75 N.W.2d 810 (husband killed his wife and was declared incompetent to stand trial); *In re Sengillo's Estate* (1954), 134 N.Y. Supp. 2d 800, 206 Misc. 751 (child killed his father and was tried on a delinquency petition in juvenile proceedings). And in two cases the courts disqualified the beneficiaries after acquittals in criminal cases of the charge of homicide of the insured: *United States v. Burns* (D. Md. 1952), 103 F.Supp. 690, *aff'd* (4th Cir. 1952), 200 F.2d 106; and *McDuffie v. Aetna Life Insurance Co.* (E.D. Mich. 1957), 160 F.Supp. 541, *aff'd* (6th Cir. 1960), 273 F.2d 609. We judge, therefore, that the word "conviction" as used in sections 15a and 49a of the Probate Act includes a finding and judgment in a civil proceeding. But we wish to make it clear that we are not holding that the word is to be so defined in every statute. Compare Ill. Rev. Stat. 1971, ch. 91, § 16a(2).

Second, the legislature is not the exclusive voice expressing the public policy of this State. (See *Molitor v. Kaneland Community Unit District No. 302,* 18 Ill.2d 11, 25, 163 N.E.2d 89; *Illinois Bankers Life Ass'n. v. Collins,* 341 Ill. 548, 551, 173 N.E. 465.) And rather than assigning to the Probate Act the legal force urged upon us, the Supreme Court in *Bradley* made it clear that its decision would have been the same regardless of the Act (7 Ill.2d 106, 115):

> "However, the validity of that statutory provision [the Probate Act] is not determinative of the issue in the instant case, but at most indicates the broad policy of the State to prohibit a murderer from enjoying by descent the fruits of his crime, since at the time of the commission of the murder defendant held, not merely an expectation of an inheritance, but a joint tenancy with the deceased, and his rights arise largely from the original instrument under which he had a right of survivorship, rather than by descent."

To accept the defendant's interpretation of the Act as the overriding expression of public policy would mean, since the Act refers only to murder, that only one guilty of murder would be barred from benefiting from the death of the slain person. That very argument was rejected in *Wilson v. Board of Trustees of the State Universities Retirement System,* 108 Ill.App.2d 210, 246 N.E.2d 701, wherein the court held, regardless of

the language of the Probate Act, a conviction for the voluntary manslaughter of her husband barred a wife from any benefits from the system in which her husband was a participant.

Third, *Bradley v. Fox*, upon which the defendant so heavily relies, divided the cases in which the question of whether a murderer may acquire a property right as a result of his crime into three categories: where the killer is a beneficiary of a life insurance policy; an heir at law or a devisee or legatee under a will; or a joint tenant. The cases dealing with heirs and joint tenants were discussed and the court pointed out that in each of those categories of cases there was a lack of unanimity. But with respect to insurance policies, the court said (7 Ill.2d 106, 112-113):

> "In the insurance cases the courts, practically with unanimity, construe the insurance policy in the light of the fundamental common-law maxim originating in English law that no man shall profit by his own wrong, and follow the approach of the early United States Supreme Court case of *N.Y. Mutual Life Insurance Co. v. Armstrong*, 117 U.S. 591, which held that a person who procured a policy upon the life of another, payable to himself, and then murdered the assured could not recover thereon. Mr. Justice Field stated: 'It would be a reproach to the jurisprudence of the country if one could recover insurance money payable on the death of a party whose life he had feloniously taken.' In conformity therewith, the Illinois courts in *Supreme Lodge Knights of Honor v. Menkhausen*, 209 Ill. 277, and *Illinois Bankers Life Assn. v. Collins*, 341 Ill. 548, construed insurance contracts as though the *public policy* and this common-law maxim were part of the contract, and denied recovery on the policy to the murderer or his heirs." (Emphasis added.)

It is significant that the Illinois case, upon which *Welsh v. James* relied and which first held that under the laws of descent a murderer could inherit from his victim in the absence of any specific legislative prohibition, distinguished the cases construing insurance policy contracts to preclude the murderer of the insured from recovery under the policy. (*Wall v. Pfanschmidt*, 265 Ill. 180, 106 N.E. 785.) In short, it has never been the public policy before or after the enactment of the Probate Act provisions involved here that one who intentionally and unlawfully killed his insured could recover under the policy.

Finally, insurance contracts are expressly excluded from the provisions of the Probate Act. Ill. Rev. Stat. 1971, ch. 3, § 601.

■■ The last contention made by the defendant is that the fees allowed the guardian *ad litem* who represented Yvette Smith were excessive and not supported by competent evidence. No record of what took place at

the hearing on fees has been submitted to this court. The order recites, "the court having considered the objections to the entry of the proposed decree and the granting of fees to the guardian ad litem and the court having heard arguments of counsel on said objections and being fully advised in the premises * * *." Such an order indicates, in the absence of any contrary indication in the record, "that the court heard adequate evidence, received enough information or listened to sufficient law and argument, as the necessity of the particular case required, to enable the court to reach what it believed to be the right decision on the issue presented." (*Ewert v. Ewert,* 41 Ill.App.2d 161, 165, 190 N.E.2d 147.) In oral argument, the attorney for the defendant conceded that he had no factual basis in the record upon which he could expect us to accept his position. For these reasons the judgment of the circuit court is affirmed.

Judgment affirmed.

BURKE, P. J., and GOLDBERG, J., concur.