(No. 47772.‒ ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇

STATE FARM LIFE INSURANCE COMPANY, v. ROSA MAE SMITH *et al.*‒(Rosa Mae Smith, Appellant; Everlean Smith *et al.*, Appellees.)

*Opinion filed March 23, 1977.*

592

DOOLEY, J., dissenting.

James D. Montgomery and William E. Holland, of Chicago, for appellant.

Howard R. Slater, of Chicago, for appellee Everlean Smith.

John A. Doyle, of Chicago, for appellees Yvette Smith *et al.*

MR. JUSTICE GOLDENHERSH delivered the opinion of the court:

State Farm Life Insurance Company filed an interpleader action in the circuit court of Cook County to determine who was entitled to the proceeds of two policies of insurance on the life of Jesse Lee Smith, who died as the result of two bullet wounds inflicted by Rosa Mae Smith, his wife (hereafter defendant). A complaint was filed charging her with murder, the grand jury voted a no true bill and there has been no criminal prosecution for the alleged offense. In a bench trial the circuit court held that defendant, although named as primary beneficiary, was not entitled to the proceeds of the policies because she had intentionally and unjustifiably killed the deceased. Defendant appealed, the appellate court affirmed (29 Ill. App. 3d 942), and we allowed her petition for leave to appeal.

At the time of his death, Smith was employed as an agent for the interpleader plaintiff, State Farm Life Insurance Company. One policy, which provided insurance in the amount of $87,422.50, named defendant as the

primary beneficiary and as contingent beneficiary Yvette Smith, the daughter of the defendant and the deceased, and Everlean Smith, the mother of the deceased. The second policy, which provided life insurance in the amount of $5,000 under a group plan for trainee agents of State Farm, named defendant as the primary and the estate of the deceased as the contingent beneficiary. Pullman Bank and Trust has been appointed administrator of the deceased's estate. In compliance with the order of the circuit court, the sum of $92,422.50 has been deposited with the clerk of that court.

The circuit court found that defendant "took the life of Jesse Lee Smith by gunshot and that the taking of the insured's life by Rosa Mae Smith was wilful, intentional and unjustified and that at that point in time at which she fired the shots she was not acting in fear of death or great bodily harm." The court ordered that after the payment of guardian *ad litem* fees and costs the balance of the $87,422.50 received under the first policy be paid to the contingent beneficiaries and that after the payment of guardian *ad litem* fees and costs the remainder of the $5,000 be paid to Yvette and Ronald Smith, minor children of the defendant and the deceased.

Defendant contends that the public policy of Illinois as declared in sections 15a and 49a of the Probate Act (Ill. Rev. Stat. 1971, ch. 3, pars. 15a and 49a), which provide that one convicted of murder may not inherit from his victim (par. 15a) and that a devise or legacy by the victim to the murderer is void (par. 49a) "requires a criminal conviction before a named beneficiary who has killed the insured can be precluded from recovering the proceeds of an insurance policy on his life." The contingent beneficiaries (hereafter appellees) argue that "The statutes which disinherit heirs or devisees convicted of the murder of their ancestor or testator support an interpretation which would disqualify Rosa [defendant] from any benefits under the insurance policy."

The Probate Act superseded the common law concerning descent and distribution (*Wall v. Pfanschmidt,* 265 Ill. 180) but does not govern the rights of beneficiaries to the proceeds of life insurance policies. (See ch. 3, par. 601.) There is no statute which disqualifies the beneficiary who has killed the insured from receiving the proceeds of the policy. In the earlier opinions of this court in which the question was considered, the beneficiary was convicted of murder (*Supreme Lodge Knights and Ladies of Honor v. Menkhausen,* 209 Ill. 277) or it was presumed that the homicide was murder (*Illinois Bankers Life Association v. Collins,* 341 Ill. 548). Here, absent a criminal conviction, the question simply put is whether, assuming defendant's action was intentional and unjustified, she is precluded from recovering the proceeds of the policy. It would appear that the long-established policy that one may not profit by his intentionally committed wrongful act should apply, and that a criminal conviction is not the *sine qua non* which would serve to preclude defendant's recovery.

Defendant contends next that "The court's finding that the taking of the life of the insured by the appellant was wilful, intentional and unjustified is against the manifest weight of the evidence." This contention requires that we determine whether the circuit and appellate courts applied the correct rule concerning the burden of proof and whether, upon application of the correct rule, the finding of the circuit court is against the manifest weight of the evidence. In their briefs appellees state: "The Trial Court held that the burden of going forward with the proof was that of Everlean Smith and of Yvette Smith, [appellees] ***, and that Rosa Mae Smith [defendant] had the burden of proof with regard to self-defense and that Everlean Smith and Yvette Smith [appellees] had the burden of proof offsetting evidence produced by Rosa Mae Smith [defendant] as to self-defense." If the decision of the circuit court rests upon findings made upon allocating the burden of proof in the manner stated by appellees, the

circuit court erred. The applicable rule, correctly stated by the appellate court, is that the burden was on the appellees to prove that the defendant's actions were intentional and that the killing of the deceased was unjustified. Upon reviewing the evidence in light of the correct rule, we hold that the finding of the circuit court is contrary to the manifest weight of the evidence.

Defendant testified that prior to the date of the occurrence she and her husband, the deceased, had been separated for approximately six months. During that period she had been living with her parents, but had occasionally stayed with the deceased. On that morning she had left her parents' home, in her automobile, at approximately 7:30 a.m. to go to her place of employment. As she approached the parking lot the deceased drove his automobile from a side street in front of her automobile. She stopped, he left his car, walked over to her car, took the keys from the ignition, parked his car, returned to her car, and entered it on the driver's side. He then drove the automobile to a point approximately a half block away from her place of employment. Defendant was approximately five feet two inches tall and weighed approximately 132 pounds. The deceased was six feet tall and weighed approximately 250 to 260 pounds.

Defendant and the deceased sat in her automobile from 7:30 a.m. until 10:30 a.m. He repeatedly asked her to come home, and she repeatedly refused. Each time that she refused, he struck her. On a number of occasions she attempted to leave the automobile, but he held her arm and would not permit her to leave. While they were sitting in her car, a mail carrier, whom she knew from her place of employment, passed by and said, "I guess somebody must be missing you at work." At about 10:30 she asked the deceased if he was hungry and he replied that he was. He drove to a McDonald's restaurant. While they were driving to the restaurant, she reached for the door several times, but he held her arm the whole time. He continued to hold

her arm during the entire time that they entered the restaurant, made their purchases and returned to the car. They sat in the automobile about 5 or 10 minutes. He then said, "I want to take you to work," and she said, "okay."

As he drove toward her place of employment, he told her that he had to go home for something. She asked that he take her to work and then he could go home. He said, "No, you go with me," and she replied she would not go home with him. She grabbed the steering wheel and he struck her in the mouth. She then opened the door and attempted to jump out, but he was holding her arm. He was trying to control the automobile and hold her at the same time. They had been driving north on Kostner Street. He made a right turn onto Washington and stopped the car in a bus loading zone.

She got out of the automobile and he slid across the seat and got out on the passenger side, still holding her arm. He struck her with his fist and knocked her down. He picked her up and knocked her down several times and kicked her while she was on the ground. At one point she tried to crawl under the car, but he grabbed her by the legs, pulled her out and stood her up. He "banged" the back of her head against the roof of the car until she was in a daze. She did not hit or kick him. She testified the beating lasted about five minutes. He then lifted her, threw her into the back seat of her two-door car, got into the car and sped off.

The day before, as she and her father were leaving her parents' home, they had met the deceased. She and the deceased argued and he struck her. She went back into the house and sometime later that day placed a gun which belonged to the deceased into her purse. The next morning she took the purse with her when she went to work. The purse was on the front seat of the car.

The deceased drove east on Washington less than a block, and when he stopped at a traffic signal at Washington and Kildare, the purse apparently fell to the

floor. Defendant was in a dazed condition and wanted to leave the automobile. He struck her repeatedly and told her to lie down because he was going to kill her. When the traffic light changed, the deceased turned left onto Kildare, and the contents of defendant's purse slid under the front seat to the back of the automobile. She picked up the gun and fired it. He turned around and with both of his hands grabbed her around the neck. She fired the second shot and got out of the car while it was still in motion. She then ran to her sister's house and called the police. The police took her to the hospital where the deceased had been taken, and then to the police station, where she was questioned. She testified that when she fired the first shot her husband had told her he was going to kill her and she believed him and that when she fired the second shot she believed he was going to kill her.

James Allen testified on behalf of the defendant. About noon on the date in question, he was on the southeast corner of Kostner and Washington getting some bricks from a building which was being razed. He saw a rust-colored compact car park in the bus zone behind his car. He saw a man whom he later identified as the deceased get out of the car, walk around to the passenger side and pull a lady out of the car. He later identified the lady as the defendant. He testified that the man hit the woman with his fists, knocking her to the ground several times. The woman tried to get away by crawling under the automobile, but the man pulled her out. The man "bounced" her head on the car until she collapsed. He then lifted her, threw her headfirst into the back seat of the car and drove away. The car turned north onto Kildare. The beating had lasted about five minutes and the woman never struck or kicked the man. Allen could not recall if the man kicked the woman.

About 5 or 10 minutes later James Allen heard a police siren blowing. He saw the police car turn north on Kildare. He drove his car around the corner and saw that

the rust-colored car he had seen earlier had struck a parked car. The man whom he had seen earlier was on a stretcher in the ambulance. A police officer showed Allen an ID card and he identified the picture as being that of the woman whom he had seen earlier in the car. Allen then went to the police station, where he made a written statement.

Ann Davis Hill, defendant's sister, testified that, when defendant was released that evening, she drove her from the police station to their parents' home. She helped bathe her and saw bruises and marks on her body, especially on her shoulders and breasts. She also noticed scratch marks on her neck and that her blouse was dirty and the collar was torn.

Officer Richard Hoffman, called by the appellees, testified that he found the gun and a purse on the right rear seat of the car. He and his partner later went to the house where the defendant had gone, and arrested her. He did not recall seeing any marks or bruises on her or that her blouse was torn, and he did not recall seeing James Allen at the scene. He said that at the time of the arrest the defendant was "crying," "quite upset," "approaching hysteria."

Officer Raymond Adams testified that when he and Officer Hoffman arrived at the scene they saw defendant's car, which had run into a parked car. The defendant was not there. The defendant's car left a skid mark 6 to 10 feet long before striking the parked car. The deceased was on the front seat, unconscious, and bleeding from the head. His buttocks were in the middle of the front seat, and he was lying sideways across the passenger seat with his head hanging over the outer side of the passenger seat. When arrested, the defendant was crying and emotionally disturbed, but he did not recall that her clothes were torn or notice any marks or bruises. He did not recall seeing or talking to James Allen at the scene.

George Stewart testified as an occurrence witness for

the appellees. His testimony is extremely difficult to follow. When the court reporter who took his deposition was called by defendant to impeach the witness on one point, the attorney for Everlean Smith stated: "If the court will recall the gentleman had a very severe speech impediment. I don't know how much difficulty the court reporter had in hearing the witness. Moreover, he was completely confused in several places in that deposition. Now, at the end of the deposition I had stopped bothering in trying to straighten him out and elucidate the facts for him and so had John Doyle" (the guardian *ad litem*).

There is considerable vacillation in his narrative, apparently because of the severe speech impediment. Basically, his version of the incident was that he was in a first-floor apartment at 218 North Kildare about noon on January 20, 1970. He heard a shot and ran to the porch. He saw a car with the driver slumped over the steering wheel screech down the street and slide into a parked white Oldsmobile. A lady in the back seat then backed out of the passenger side of the car and fired a second shot at the man while he was still slumped over the steering wheel. She threw the gun into the back seat of the car and ran. He did not tell the police at the scene what he had seen.

Investigator John Leonard of the Chicago Police Department testified that later that day he took a statement from defendant in which she described the beating and the shooting. He did not recall seeing any marks or bruises. On cross-examination he admitted that James Allen came to the police station while he was interrogating the defendant. He talked with Allen outside defendant's presence, took his statement and included it in his report. On redirect examination the witness was asked and answered:

> "Q. Now, with respect to Mr. Allen, I ask you to think back now. I think Mr. Montgomery asked you if he appeared at the 15th District while you were interrogating Rosa Mae Smith, and you said 'yes?'

A. Yes.
Q. On reflection, is your answer the same?
A. Yes."

The appellate court stated that "[i] n addition to the improbabilities in her [defendant's] own testimony and the contradictions between her and Allen, the trial court heard the testimony of Stewart, so damaging to the defendant," and held that "the trial court, who was the judge of the credibility of the witnesses, could properly conclude that the killing was willful and intentional and at the time she fired the gun the defendant did not reasonably believe that she was in danger of suffering death or great bodily harm." (29 Ill. App. 3d 942, 949.) Appellees urge that based on the "improbability" of defendant's testimony and contradictions between her testimony and that of Allen and Stewart, we reach the same conclusion as did the circuit and appellate courts. We will examine these "improbabilities" and "contradictions."

The appellate court found improbable defendant's testimony that although she had been held captive by her husband for three hours that morning, and had been struck by him more than eight times, she had made no outcry either to the mailman or to the clerk at McDonald's restaurant. There was evidence that defendant and the deceased had been quarreling for months before July 20, 1970, and that he had struck her on previous occasions, and we do not find it improbable that at that point she was not in fear of her life or of great bodily harm.

The appellate court also found improbable defendant's testimony that after the first shot the deceased turned and began choking her with both hands. It stated: "One of the bullets lodged in the deceased's brain. There were three bullet wounds: one about two inches above his right ear; another one inch to the right of and one inch above the right eye; and another at the center of the forehead. Whether they were wounds of entry or exit could not be determined by Investigator Leonard. One of

them must have been an exit wound. But, in any event, it is inescapable that the first shot caused one of them; and it is difficult to believe that a man who suffered any of the wounds described would be able to turn and begin choking her." 29 Ill. App. 3d 942, 948.

It does not necessarily follow from the nature of the first wound (whether it was the one that penetrated the skull or lodged in the brain) or from Stewart's testimony that the deceased was unconscious at the time the second shot was fired. Concededly, he was unconscious after both wounds had been inflicted, but he did not die for more than a month. Although Stewart testified that after he heard the first shot he saw the deceased slumped over the steering wheel he stated, too, that while the deceased was in that position he heard the screeching of the tires, the sliding of the car into the parked car and then the second shot.

It is undisputed that the deceased was driving and that defendant was in the back seat of the car when the first shot was fired. The "screeching sound" which Stewart said he heard and the 6- to 10-foot skid mark found by Officer Adams would indicate that the deceased forcefully applied the brakes after the first shot. Stewart's description of the deceased slumped over the steering wheel after the car came to rest against the parked car and at the time the second shot was fired conflicts with the testimony of Officer Adams that the deceased was unconscious and lying across the passenger seat with his head hanging over the outer side of the passenger seat. The evidence of the forceful application of the brakes following the first shot, and the position of the unconscious body when the police arrived, is consistent with the defendant's testimony and inconsistent with that of Stewart.

The testimony of defendant and her sister that she was bruised and her clothes torn was not refuted by the testimony of Officer Hoffman, Officer Adams, Investigator Leonard or the photograph of defendant taken by the

police on the day of the shooting. The police officers testified that they did not recall seeing bruises or a torn blouse. They did not examine her for bruises, and none of them would testify that she did not have bruises. Defendant's sister testified that the bruises were on the shoulders and breasts. The photograph does not show the shoulder or breast areas of defendant's body, but her blouse appears to be torn and dirty.

The appellate court also commented on the discrepancies in the testimony of defendant and Allen in describing the events at Washington and Kostner. "She said the deceased slid across the front seat; Allen said he got out of the car and walked around to the passenger side. She said the deceased kicked her; Allen said he did not recall the deceased kicking her. She said the car was parked in the street; Allen said it was at the curb. She said there were eight people waiting for a bus a few feet west of her; Allen said the only people around were three or four house painters at a building 200 feet east of the bus stop." These discrepancies do not appear to be of significance.

The testimony of defendant and Allen concerning the vicious beating at Kostner and Washington is convincing for several reasons. Both witnesses basically and correctly described the location, the time, the repeated striking and knocking down, the attempt to crawl under the car, the banging of the back of her head against the roof of the car, the throwing her into the back seat of the car and the driving away. She made her statement to Investigator Leonard that afternoon without the assistance of counsel or friends and did not know that an eyewitness to the occurrence was at the same time also making a statement about the incident. Allen had never before seen defendant or her husband. He came forward and made his statement that same day without having talked to defendant or anyone else connected with her about what he had seen. The basic similarity in these two completely independent statements shortly after the incident requires credence in

their important aspects—the deceased was the aggressor at all times, the severity of the beating, and the dazed condition of the defendant.

In *People v. McGraw*, 13 Ill. 2d 249, a jury found defendant McGraw guilty of murdering Roushorn, an off-duty policeman, and this court, finding that the evidence was sufficient to show self-defense, reversed the conviction. In that case McGraw was driving a truck, which without his knowledge scraped the rear fender and door of Roushorn's car, causing $5 to $20 damage. Roushorn chased him; and McGraw, when he learned someone was following him, stopped his truck and went back to talk to Roushorn, who had now stopped. Roushorn became very angry and repeatedly accused McGraw of deliberately sideswiping his car. McGraw denied this accusation and indicated that the matter could be settled without trouble. Roushorn had become so aroused that he beat McGraw about the head until the latter dropped to his knees. McGraw noticed that Roushorn had a revolver in a hip holster and blackjack in his pocket and realized that Roushorn was a police officer. He begged Roushorn not to hit him and asked to be arrested. McGraw finally told Roushorn he would not be beating him if he did not have a gun. Roushorn put his belt, holster and revolver in his car and returned to resume the attack. Roushorn was six feet one inch tall and weighed 240 pounds, and McGraw was five feet nine inches tall and weighed 175 pounds. While Roushorn was distracted temporarily by a spectator, McGraw went to Roushorn's car and got his revolver. Although McGraw showed Roushorn he had the gun, Roushorn started at McGraw, and McGraw fired all six rounds in the pistol at Roushorn, two of which mortally wounded him.

After finding that McGraw was peaceably on a public street when he was made the subject of a totally unwarranted and unprovoked attack and that Roushorn, who was the aggressor, showed no sign of giving up the

attack, the court stated that the vital question became "whether it was necessary or apparently necessary to fire the gun to stop further assault" (13 Ill. 2d 249, 257). On this matter the court stated: "In determining the question of apparent necessity, we must view the situation through the eyes of the defendant. He was frightened (had been stunned by the blows as one witness put it), he had reason to believe that the attack would be resumed because of the removal of the gun, and knew that his huskier assailant was capable, both physically and by temperament, of doing him bodily harm since he had done it once." 13 Ill. 2d 249, 257-58.

Here defendant was peaceably on her way to work when her husband prevented her going to work, engaged her in argument, became infuriated and administered a vicious beating which left her dazed. As he continued to strike and threaten to kill her, she obtained a gun that had been in her purse and fired two shots. She then ran to a place of safety and immediately called the police. After being given *Miranda* warnings, she freely and without counsel made a statement to the police.

After reviewing all of the evidence, we are of the opinion that appellees have not sustained their burden of proof that defendant at the time she fired the shots was not acting in fear of death or great bodily harm and that the taking of the life of Jesse Lee Smith was unjustified. This was a bench trial, and since appellees make no contention that erroneous rulings by the circuit court precluded the introduction of all their evidence, no purpose will be served by remandment. (*Dayton Scale Co. v. General Market House Co.*, 335 Ill. 342.) The judgments denying defendant, the primary beneficiary, from taking the proceeds of the two insurance policies on the life of the deceased are reversed and the cause is remanded to the circuit court of Cook County with directions to enter judgment in favor of defendant.

Defendant has also argued that the fees awarded to

the guardian *ad litem* were excessive and arbitrary. There is no evidence in the record to support this argument, and those parts of the circuit and appellate court judgments which award and affirm the award of guardian *ad litem* fees are affirmed.

*Affirmed in part and reversed in part and remanded, with directions.*

MR. JUSTICE DOOLEY, dissenting:

The majority, in my opinion, has violated our system of appellate review. Not only does it hold for naught the finding of a trial court in a nonjury case, a finding affirmed by the appellate court, but it performs the function of a *nisi prius* court. It determines the credibility of the witnesses, draws inferences of fact, and then arrives at a conclusion it considers more reasonable; this determination, however, differs from that of both the circuit and appellate courts. Such is not the office of this court.

As the majority points out, the very able circuit judge, Walter P. Dahl, specifically found, after seeing and hearing the witnesses, that the defendant "took the life of Jesse Lee Smith by gunshot and that the taking of the insured's life by Rosa Mae Smith was wilful, intentional and unjustified and that at that point in time at which she fired the shots she was not acting in fear of death or great bodily harm."

It is, of course, well established that this court will not disturb the findings made by a trial court in a nonjury case.

The rule is both well expressed and well explained in *Schulenburg v. Signatrol, Inc.* (1967), 37 Ill. 2d 352, 356:

"Although a trial court's holding is always subject to reivew, this court will not disturb a trial court's finding and substitute its own opinion unless the holding of the trial court is manifestly against the weight of the evidence. (*Brown v. Zimmerman,* 18 Ill. 2d 94, 102; *Illinois*

*Nat. Bank & Trust Co. of Rockford v. County of Winnebago,* 19 Ill. 2d 487, 495; *Mortell v. Beckman,* 16 Ill. 2d 209.) Underlying this rule is the recognition that, especially where the testimony is contradictory, the trial judge as the trier of fact is in a position superior to a court of review to observe the conduct of the witnesses while testifying, to determine their credibility, and to weigh the evidence and determine the preponderance thereof. We may not overturn a judgment merely because we might disagree with it or might, had we been the trier of facts, have come to a different conclusion."

(See *Turner v. Board of Education* (1973), 54 Ill. 2d 68, 72-73; *Reese v. Melahn* (1973), 53 Ill. 2d 508, 512-13; *Kenny Construction Co. v. Metropolitan Sanitary District* (1971), 52 Ill. 2d 187, 196.) In each instance this court reversed the appellate court for setting aside the finding of the trial court in a nonjury action.

In fact, this principle is so well established that today marks the first time in the history of Illinois jurisprudence that such a finding in a nonjury case, affirmed by the appellate court, has been set aside by this court as contrary to the manifest weight of the evidence.

The majority opinion says that the circuit court might have erred on the issue of the burden of proof. It states:

" 'The Trial Court held that the burden of going forward with the proof was that of Everlean Smith and Yvette Smith, [appellees] ***, and that Rosa Mae Smith [defendant] had the burden of proof with regard to self-defense and that Everlean Smith and Yvette Smith [appellees] had the burden of proof offsetting evidence produced by Rosa Mae Smith [defendant] as to self-defense.' If the decision of the circuit court rests upon findings made upon allocating the burden of proof in the manner stated by appellees, the

circuit court erred. The applicable rule, correctly stated by the appellate court, is that the burden was on the appellees to prove that the defendant's actions were intentional and that the killing of the deceased was unjustified."

In neither the appellate court nor in this court was any error in the burden of proof charged by defendant. Accordingly, that issue is not before us. *Certain Taxpayers v. Sheahen* (1970), 45 Ill. 2d 75.

There was no misconception in the burden of proof. This is manifest from the appellate court opinion:

"At this juncture, since the parties disagree on the application of the term, we deem it appropriate to discuss the 'burden of proof.' The phrase has been used to mean either the necessity of establishing a fact, that is, the burden of persuasion, or the necessity of making a prima facie showing, that is, the burden of going forward. (See McCormick on Evidence sec. 336 (2d ed. 1972).) The pleadings established that Jesse Smith was dead and that the defendant was named beneficiary. That being so, the trial court correctly ruled that the contingent beneficiaries had the burden of going forward and also the burden of proving that Rosa Mae Smith was barred from recovery. One claiming the proceeds of a life insurance policy as against the named beneficiary has the burden of establishing his claim. (44 Am. Jur. 2d Insurance sec. 1977; *Minnesota Mutual Life Ins. Co. v. James,* 202 F. Supp. 243.) Once the contingent beneficiaries established that the defendant had killed the deceased, the burden was then on her to 'go forward' with the introduction of some evidence showing circumstances justifying or excusing her acts, unless it was sufficiently manifest from the proof on the part of the contingent beneficiaries that she was justified or excused in committing the

homicide. But once evidence of self-defense was interposed, whether by the contingent beneficiaries or the defendant, the overall burden of persuasion was placed on the contingent beneficiaries to show that it was more probably true than not true that the defendant did not act in self-defense. *Cf. People v. Warren,* 33 Ill. 2d 168, 173, 210 N.E. 2d 507." *State Farm Life Insurance Co. v. Smith* (1975), 29 Ill. App. 3d 942, 947.

On burden of proof, we have this situation:

(1) The contingent beneficiaries have the burden of proving that the defendant beneficiary was barred from recovery;

(2) Once it was established that the defendant beneficiary had killed the deceased, the burden was upon her to justify her act; and

(3) Once evidence of self-defense was introduced, the burden of persuasion was on the contingent beneficiaries.

The key question in the posture of the case as it stood was whether the defendant's action constituted an unjustified killing of the deceased. That this could not be error is obvious from the specific finding of the circuit court. It concluded that the defendant had without cause killed the deceased, and could not take the proceeds of the insurance policy.

Unfortunately, the majority opinion is dedicated to dissolving the improbabilities that the appellate court noted in affirming the finding of the trial court. To set aside the judgment of both the circuit and appellate courts means that there must be resolved, favorable to the defendant beneficiary, the following:

(1) The defendant beneficiary was carrying a gun in violation of law (Ill. Rev. Stat. 1969, ch. 38, par. 24—1(a)(4); Municipal Code of Chicago, Public Peace and Welfare sec. 193—30). She had placed a gun in her handbag either the day of the

shooting or four months prior thereto, depending upon which version of the defendant is accepted. Obviously this was an act done with deliberation, and for the purpose of using this firearm.

(2) Although she contended that throughout the morning she was subject to the deceased's control, she admits spending three hours with him discussing their marriage and even leaving the car to go to McDonald's for hamburgers. Certainly she could have made known her plight—if it was as she described—to those in the hamburger stand.

(3) As the car slowed down, the gun in the purse somehow slid out from under the front seat, as if through some magic power. However, she stated that she could have told Officer Leonard she pulled it from her purse.

(4) If that were not enough, she fired it once with the bullet striking the deceased in the head. She then states that the deceased was choking her so she fired a second shot into his head. One of the two bullets lodged in the brain. Whether it was the first or second is not known. Two shots in the head of an alleged aggressor make a plea of self-defense paradoxical. It is comparable to an alleged aggressor being found shot in the back. Certainly no Deadwood jury of "Wild Bill" Hickcock's era would accept this contention. The trial judge was on solid ground.

(5) The defendant beneficiary contended the deceased had physically abused her, striking her at least eight times during the initial three hours they were together, as well as several times immediately prior to the shooting. So also it was contended on her behalf that there were bruises on her shoulder and arm, and her blouse was torn after the killing. Yet certain evidence makes this improbable. Shortly after the occurrence at the police station

she gave no reason for shooting a man. Would it not be natural for the defendant to state why she shot a man?

The police who interviewed her saw no bruises, markings or bleedings on her person. Nor were any tears or rips in her clothing observed. Better yet, this evidence of her physical condition was dissipated by pictures taken by the police.

(6) Officer Hoffman testified that when he questioned her, she said: "It's his gun. I took it with me this morning because I was sick of him messing on me." Investigator Leonard testified defendant told her she had possession of the gun for about four months prior to the shooting. These are illustrative of the many contradictions in her testimony.

(7) Most important of all is the evidence of the eye witness, George Stewart. The majority would discount his testimony because of a speech impediment, saying:

"George Stewart testified as an occurrence witness for the appellees. His testimony is extremely difficult to follow. When the court reporter who took his deposition was called by defendant to impeach the witness on one point, the attorney for Everlean Smith stated: 'If the court will recall the gentleman had a very severe speech impediment. I don't know how much difficulty the court reporter had in hearing the witness. Moreover, he was completely confused in several places in that deposition. Now, at the end of the deposition I had stopped bothering in trying to straighten him out and elucidate the facts for him and so had John Doyle' (the guardian *ad litem*).

There is considerable vacillation in his narrative, apparently because of the severe

speech impediment."

But what did Stewart contribute? He heard a shot from a nearby apartment. He then saw a car go down the street with a man in the driver's seat leaning over the steering wheel. This car hit a parked car. He ran down the stairs. He then saw a woman, the defendant, exiting from the right door with a gun in her hand. He heard a second shot as the woman was leaving the car. She threw the gun in the back of a car where the police found it. She ran down the street. Defendant admittedly went to the apartment of her cousin from which the police were called.

Obviously this evidence was directly contrary to the contention of the defendant. The facts as related by Stewart nullified defendant's contention.

It has been said that the written word is as different from the spoken word as the portrait of a man differs from the man himself. The circuit judge observed Stewart testifying on direct and cross-examination. His demeanor and general characteristics manifested on the stand do not appear in this lifeless record. Only those who saw and heard Stewart knew the full impact of his testimony.

Such circumstances as these prompted one of the great judges in the history of this court to make part of our decisions an excellent description of the gulf between the trial judge and the reviewing court. We repeat it here with the hope that it shall serve as an admonition to reviewing courts. In *Kettlewell v. Prudential Insurance Co. of America* (1954), 4 Ill. 2d 383, 393-394, Mr. Justice George W. Bristow, a man who brought to this court almost three decades of experience as a circuit and appellate judge, quoted:

" 'He [trial court] sees and hears much we cannot see and hear. We well know there are things of pith that cannot be preserved in or shown by the written page of a bill of exceptions. Truth does not always stalk boldly forth naked, but modest withal, in a

printed abstract in a court of last resort. She oft hides in nooks and crannies visible only to the mind's eye of the judge who tries the case. To him appears the furtive glance, the blush of conscious shame, the hesitation, the sincere or the flippant or sneering tone, the heat, the clamness, the yawn, the sigh, the candor or lack of it, the scant or full realization of the solemnity of an oath, the carriage and mien. The brazen face of the liar, the glibness of the schooled witness in reciting a lesson or the itching over-eagerness of the swift witness, as well as honest fact of the truthful one, are alone seen by him. In short, one witness may give testimony that reads in print, here, as if falling from the lips of an angel of light and yet not a soul who heard it, *nisi,* believed a word of it; and another witness may testify so that it reads brokenly and obscurely in print, and yet there was that about the witness that carried conviction of truth to every soul who heard him testify.' " *Creamer v. Bivert* (1908), 214 Mo. 473, 479, 113 S.W. 1118, 1120.

To me it is patent that the majority has overloaded the circuits, so to speak, in reversing the judgments of both the circuit and appellate courts on so narrow a line. The words "manifest weight of the evidence" are no magic talisman by which a judgment dependent upon the credibility of witnesses and the inferences to be drawn from the trier of the facts may be overturned.

The significance of these words is best defined by appellate court opinions. "Manifest weight of the evidence" is not a conjunction of grammarians, so to speak; these words have a definite meaning at law. "To be against the manifest weight of the evidence requires that an opposite conclusion be clearly evident." (*Arboit v. Gateway Transportation Co.* (1957), 15 Ill. App. 2d 500, 507; *Griggas v. Clauson* (1955), 6 Ill. App. 2d 412, 419.) "Manifest weight has been defined as that weight which is clearly evident,

clear, plain and indisputable." (*Singles v. Horwitz* (1975), 34 Ill. App. 3d 973, 975.) "By manifest weight is meant the clearly evident, plain and indisputable weight." *Wisniewski v. City of Chicago* (1974), 20 Ill. App. 3d 650, 653.

There is, of course, a distinction between "weight of the evidence" and "contrary to the manifest weight of the evidence." Mr. Justice O'Connor, who wrote many leading opinions in his years in the appellate court, described this in reversing a judgment where the trial court had refused to pass on the weight of the evidence on a motion for new trial. He observed:

> " '*** It is then the duty of the trial judge to consider the weight of the evidence and if he is of opinion that plaintiff has not proven his case by a preponderance of the evidence, taking into consideration the fact that the jury has found otherwise, it is his duty to set aside the verdict and grant a new trial. And if the court does not do so but overrules the motion and enters judgment and the case is then brought to this court, we are not authorized to disturb the verdict on this ground unless the verdict and judgment are against the manifest weight of the evidence. This court in passing on the question must take into consideration not only the verdict of the jury but the fact that the trial judge saw and heard the witnesses, overruled the motion for a new trial and entered judgment. It requires much more for this court to set aside a verdict and judgment than is required of the trial judge.' " *Read v. Friel* (1946), 327 Ill. App. 532, 542.

It is obvious that the manifest weight of the evidence is a judicial cat-o'-nine-tails reserved for extraordinary situations. This obviously is not such. We have far less ability to judge the facts than the circuit judge. Nor can we profess to read a record with more expertise than the appellate court.

Today the stability of the Illinois appellate process has

been deeply affected. A judgment in a nonjury case, although affirmed by the appellate court, has been reversed by this court simply because it considered other conclusions more reasonable than those of both the trial and appellate courts.

When this court undertakes to reverse a judgment entered in a nonjury trial and affirmed by the appellate court because this court feels other inferences can be made, we are not aiding the cause of sound judicial administration. When will a litigant know he has a final judgment on the facts if this court is to pursue such a course of conduct?

The long-range effect of this opinion is to encourage appellate courts to reverse judgments on the manifest weight of the evidence—a condition from which in yesteryear there was no remedy. (See *Olson v. Chicago Transit Authority* (1953), 1 Ill. 2d 83; *Petty v. Illinois Central R.R. Co.* (1957), 11 Ill. 2d 485.) In the past the only alternative was for a party to consent to a final adverse judgment in order to seek leave to appeal to this court. (*Bowman v. Illinois Central R.R. Co.* (1957), 11 Ill. 2d 186, *cert. denied* (1957), 355 U.S. 837, 2 L. Ed. 2d 49, 78 S. Ct. 63.) The Judicial Article of 1962 (Ill. Const. 1870, art. VI, sec. 5) has corrected this unwholesome situation. It was not the intent of that article or the Constitution of 1970 (art. VI, sec. 4(a)) to perpetrate this unhealthy condition by transferring from the appellate court to this court the power to set aside a finding in a nonjury case as contrary to the manifest weight of the evidence when that finding had been affirmed by the appellate court. More than that, the fact remains that this court is not wont to grant petitions for leave to appeal where the appellate court has reversed on the manifest weight of the evidence.

I would affirm the judgments of the circuit and appellate courts.