In re ESTATE OF PAUL HOOK, Deceased (Byron Hook, Objector-Appellant, v. Lillian Juanice Hook, Respondent-Appellee).

Fifth District No. 5—90—0118

Opinion filed January 3, 1991.

Gregory A. Veach, of Barrett, Twomey, Morris, Broom & Hughes, of Carbondale, for appellant.

No brief filed for appellee.

JUSTICE WELCH delivered the opinion of the court:

Byron Hook (hereinafter objector) appeals from the order of the circuit court of Johnson County entered January 24, 1990, denying objector's post-trial motion, and the order entered October 13, 1989, denying objector's petition objecting to distribution of the estate of his brother, Paul Hook (hereinafter decedent), to Lillian Juanice Hook (hereinafter respondent). We affirm.

Respondent and the decedent were married on September 28, 1984. It was the first marriage for both; respondent was aged 42 and decedent was aged 67 at the time. Respondent had been employed for several years in the coal mines in southern Illinois. After the marriage she worked for her husband in his LP gas business. Decedent operated Hook Brothers Gas Company, a partnership decedent owned with his brother, Carl Hook. Carl and his wife, Frances, who lived in Carlinville, Illinois, took care of the books for the business.

The business was located on a small farm where decedent and respondent lived on Bilou Church Road near Vienna, Illinois. The farm had been owned by decedent's parents but title had never been transferred after the last surviving parent died in 1982 because neither of his parents' estates was administered. Decedent, objector, Carl, Henry, and Frances Hook were heirs of the deceased parents.

Decedent was murdered on September 18, 1985. The pathologist who performed the autopsy determined that death was caused by cardiac tamponade resulting from 13 stab wounds to the chest. In addi-

tion, decedent was struck on the back of the skull, a blow, the pathologist opined, which would have rendered decedent unconscious. Death would have occurred within 15 minutes of the attack. In the pathologist's opinion, it was medically impossible for decedent to have inflicted all of these wounds on himself. The pathologist opined that the approximate time of death was between 7 p.m. and 10 p.m. on September 18, 1985.

After filing a petition for letters of administration, proof of heirship, oath and bond, respondent was named administratrix of decedent's estate and declared to be decedent's sole heir on September 30, 1985. Respondent was arrested and charged with the murder of her husband in December 1985, but was released three weeks later for lack of probable cause. Linda Boyd was a cellmate of hers during the time respondent spent in jail. At a criminal trial in 1988, a jury found respondent not guilty.

Objector filed a petition on May 16, 1986, pursuant to section 2—6 of the Probate Act of 1975 (Ill. Rev. Stat. 1985, ch. 110½, par. 2—6), to vacate the order declaring heirship, to enjoin distribution, release or dissipation of decedent's property, and to quiet title to real and personal property. This provision of the Probate Act provides in pertinent part as follows:

> "Person causing death. A person who intentionally and unjustifiably causes the death of another shall not receive any property, benefit, or other interest by reason of the death, whether as heir, legatee, beneficiary, joint tenant, survivor, appointee or in any other capacity and whether the property, benefit, or other interest passes pursuant to any form of title registration, testamentary or nontestamentary instrument, intestacy, renunciation, or any other circumstance. The property, benefit, or other interest shall pass as if the person causing the death died before the decedent, provided that with respect to joint tenancy property the interest possessed prior to the death by the person causing the death shall not be diminished by the application of this Section. A determination under this Section may be made by any court of competent jurisdiction separate and apart from any criminal proceeding arising from the death, provided that no such civil proceeding shall proceed to trial nor shall the person be required to submit to discovery in such civil proceeding until such time as any criminal proceeding has been finally determined by the trial court or, in the event no criminal charge has been brought, prior to one year after the date of death. A person convicted of first degree murder or second de-

gree murder of the decedent is conclusively presumed to have caused the death intentionally and unjustifiably for purposes of this Section." (Ill. Rev. Stat. 1987, ch. 110½, par. 2—6.)

Respondent filed a motion to strike the petition, claiming that objector was not an interested party, the motion to vacate the order claiming heirship was filed more than 30 days after its entry and no adjudication had been made that respondent caused or was responsible for decedent's death. After oral argument and submission of authority, the court denied the motion to strike and entered an order that, until determination of objector's petition under section 2—6 of the Probate Act, administratrix was enjoined from distributing or dissipating assets of the estate.

On December 12, 1986, objector filed a petition to amend the order declaring heirship and objecting to distribution of property to respondent, again based on section 2—6 of the Probate Act. On July 9 and 10, 1987, Judge Horman heard testimony on the petitions and admitted the evidence deposition of Dr. Miles J. Jones, the pathologist who performed the autopsy on the decedent.

At the same hearing, Frances Hook testified that she witnessed respondent's temper toward decedent after his release from the hospital. He had been in the hospital in early 1985 after he injured his shoulder falling from a tree. She said that respondent got angry with decedent because his instructions on gas deliveries were too specific, at which time she cursed at him and slammed doors, saying she was going and she wasn't coming back. Frances admitted that when respondent returned she apologized for, in Frances' words, "her maniacal display of temper." She also stated that respondent was surprised to learn from her that Paul did not own all of the farm, gas company and certain other property.

Frances Hook also testified that she saw decedent two weeks before his death and that he seemed thinner and depressed and had great pain in his shoulder. Herbert Hook, decedent's cousin, also saw decedent two weeks before his death and noticed that he was thinner and testified that decedent had commented that his wife, who weighed 220 pounds, could handle 100-pound gas tanks and was pretty wicked with a knife and the English language. He never witnessed any arguments between the two, however, and neither did Joe Hunter nor Cecil Baltzell, good friends of decedent, who both testified that the couple got along well. Baltzell testified that respondent worked hard to help her husband. Another friend, Charles Burnham, said the only disagreement he witnessed between the couple had to do with the remodeling respondent wanted to do to the house.

Respondent testified that she had known the decedent for 16 years before she married him in 1984. She testified that they had had two serious disagreements during their marriage. The first disagreement involved decedent's insistence on going out in an ice storm to show some men how to operate a tractor, after his recent release from the hospital and while he still had a brace on his arm. The second disagreement involved decedent's refusal to put clothes on over his long underwear when his brother and sister-in-law came over to visit. She insisted that she never threatened to divorce decedent but told him if he didn't want her to take care of him she would leave. She admitted having a temper but denied killing her husband.

While she couldn't think of anyone who would want to kill decedent, she stated that he had a habit of carrying around a large amount of cash in his shirt pocket. She admitted that decedent owned seven dogs which slept on the porch and that they generally barked when people or animals came on the property. She also stated that there were two security lights by the loading platform where decedent's body was found and that the chain across the drive leading up to the platform was hooked. She admitted that she sold decedent's firearms worth $13,000 and that she became the sole owner of a joint bank account following his death. She denied Frances Hook's testimony that she was surprised that decedent did not own all of the farm and business and said that she had discussed this with him before they married.

Respondent testified that she had been gone most of the day on September 18, 1985, with two friends, moving some household goods from her trailer to the house. Her friend, Dianna Mummy, came over with her truck and picked up some items and, after helping Mummy unload them at Mummy's house, respondent returned home about 7 p.m. She testified that at approximately 7:30 p.m. a vehicle drove onto the property and decedent walked outside. He turned around and came back inside, then walked back outside again. Respondent thought he had forgotten his hat. She did not go to see what type of vehicle it was or who was in the vehicle but she remembered hearing decedent's and two other voices. She thought the vehicle sounded like a truck. She did not remember hearing the dogs bark. Approximately an hour to an hour and a half later she heard decedent talking to some people again and then the vehicle left.

Respondent was watching television in the kitchen throughout the evening. She said there was a lot of traffic on Bilou Church Road that night because it was a church night. She remembered a telephone call from decedent's cousin, Herbert Hook, some time during the evening

and told him that her husband would call him when he came back inside. Herbert testified that he called the house about 8 p.m. Respondent testified that she was on the phone with Lori Walker from 8:30 to 8:55 p.m.

After respondent finished her phone call with Walker, respondent testified that she walked outside on the porch and called for her husband but got no response. She again went outside at 10 p.m. and walked toward the loading dock. She testified that the dock was lit up and that nothing seemed disturbed. She also looked toward the barn and called for her husband but again got no response. She figured her husband had gone with the men in the vehicle to chase a bull that they had sold to a broker a few days earlier, but which had escaped when they tried to load it on the truck going to the livestock auction. She said it wasn't unusual for decedent, who had been a single man for so many years, to leave without telling her where he was going.

Respondent testified that around 1:45 to 2 a.m. she heard some dogs barking in the field. She put her shoes on, picked up a gun and flashlight and went outside. At this time, she testified the dogs were asleep on the front porch. It was shortly thereafter that she discovered her husband covered with blood and lying by the gas tank which was located approximately 8 to 10 feet away. She did not go over to him but instead went back into the house and called for an ambulance, telling the dispatcher that her husband had fallen. She then called her friends, Lori and Lee Walker, and asked them to come over. The ambulance arrived shortly thereafter and the attendants told respondent that her husband was dead. They notified the sheriff's and coroner's offices. The Walkers arrived shortly thereafter and respondent called decedent's brothers, her parents and Diane Mummy. She was interviewed by the sheriff, who asked her to look for decedent's billfold, which was missing.

Claude Harper, one of the ambulance attendants, testified that respondent seemed disturbed after he told her that her husband was dead. He testified that he did not observe any indication of a scuffle in the area. Randy Ren, another attendant, agreed that respondent seemed upset when they first talked to her.

Sherry Kerley, the dispatcher, testified that she took respondent's call requesting an ambulance about 2:15 a.m., and that she asked for directions and the type of injury. She stated that respondent said her husband was lying in the yard, unconscious, bleeding from the head and that he had gone out earlier to wait on a gas customer, that she had "hollered for him" but he had never come back.

Richard Sweeney, a deputy with the sheriff's department, said

that he had taken a call about 9 that evening about a bull being out. He also responded to the call from the ambulance attendants about Paul Hook's death. He said that although there was no sign of a struggle, the hose from the LP gas tank was lying out from the tanks by Hook's body.

Sheriff Faulkner also noted that the hose was not in its position behind the scales and that decedent's shirt pocket was unbuttoned and empty. Decedent's wallet was never found. Faulkner searched the house for an ice pick because the crime scene technician said the wounds appeared to have been caused by that type of weapon, but was only able to locate a rusted pick in the wall on the back porch and it was obvious that it hadn't been used in a while. Respondent told Sheriff Faulkner there were no ice picks at the house when he spoke with her a week after the murder. Later, after respondent had moved to Tennessee, she produced two icepicks at his request. She represented to him that one of the ice picks had been located in the wall on the back porch and one had been stored in a drawer which Sheriff Faulkner had searched the morning after the murder but had not seen when he performed the search. These items were eliminated forensically as being the murder weapon. Moreover, none of the hammers located at the house were shown to have caused the wound to the back of decedent's head.

Faulkner had served in law enforcement for 17 years but had taken part in only three homicide investigations, including Paul Hook's homicide, during that service. Faulkner interviewed respondent on the morning of September 19, 1985, and noted that she was angry and upset. He interviewed respondent two more times in the next few days, and she never changed her story from the first time he interviewed her. No weapon was found and decedent's hat was not located. Respondent told him that her husband always wore a hat. In Faulkner's opinion someone who didn't know anything about decedent's habits placed the LP gas hose on the ground in order to make it look like decedent had been waiting on a gas customer. He admitted that this would exclude respondent, who knew from operating the business that decedent would not lay the hose there. However, Faulkner was permitted to testify, over objection, that in his opinion only one person could have been responsible for the death of Paul Hook and that was respondent.

Frances Hook testified that about a month after the murder, respondent told her husband and her that she had been receiving crank phone calls accusing her of killing Paul and that respondent then played an answering machine recording wherein a woman's voice

said, "Murderer." Frances testified that respondent was bothered by this and said, "[s]he's right, you know, I am." Frances reported this "admission" to Sheriff Faulkner but he testified that he did not follow up on it. Respondent testified that she did not remember saying anything to Frances and Carl Hook about this, but that she did feel guilty over her husband's death because she sat in the house while somebody killed him. She also testified that it was Carl who put the answering machine in the house after Paul Hook died.

Greg Geittmann, a State trooper, was called in to aid in the investigation. Geittmann had been a trooper for 14 years and had served as a criminal investigator for eight years, during which time he participated in 24 homicide investigations and 400 other criminal investigations. Geittmann interviewed 30 to 35 persons including respondent, but admitted that there were no eye witnesses to the murder. Over respondent's objection Geittmann gave an opinion that respondent was responsible for Paul Hook's death. He testified that he based this opinion on statements of others that discounted respondent's story that she thought Hook was out chasing a bull that night. These witnesses told Geittmann that Hook had never before helped to capture the bull; also his age and poor health and possibility of injury made it unlikely that he would have done this. Geittmann also based his opinion on his interview of Linda Boyd, although the court sustained an objection to a recounting of her statement. Finally, because there was no one else present that evening and no sign of struggle at the scene, Geittmann opined that decedent knew his murderer.

As Sheriff Faulkner noted, respondent told Sweeney, Geittman and Faulkner approximately the same story, that Paul had gone outside to wait on a customer, that he had left about 30 minutes later, that the vehicle sounded like a truck although she could not identify who had driven up to the residence, and that she did not become alarmed when he did not return because she thought Paul had gone with some people who had been chasing a bull. Although Jerry Meyer, Louis Whiteside and Charles Cook all testified that decedent had never before helped them to catch the bull, Cook admitted that the bull was still loose the night Hook was killed. Respondent testified that when she said she thought her husband had gone with the men to help them find the bull she meant that he probably went with them to show them where the bull had been sighted the day before. Whiteside also testified that on the evening of September 18, 1985, he had seen a green truck backed in by the side of Hook's garage with an LP gas tank in it.

Alice and Willie Hawkins traveled Bilou Church road that evening

going to services, and Alice testified that she saw a man in the back-yard that looked like Paul Hook at approximately 6:45 p.m. Neither saw any cars coming from the opposite direction when they left church about 8:45 p.m. While Alice did not see any lights in the front of the house, respondent testified that the only light she had on that night was in the kitchen, where she was watching television, and the kitchen was in the back of the house.

Denise Thornton, wife of the pastor of Bilou Church, also saw a man standing by the gas tanks at approximately 6:50 p.m., and she assumed it was Paul Hook. She asked her husband if they should stop and invite Hook to services but he said there was a motorcycle there; he had company. She testified that there was a truck on the right side of the tanks when they were on their way to church but that it had been moved to the left side of the tanks when they were on their way home. They saw no lights on in the house and they saw no one outside.

Linda Boyd was subpoenaed to testify the night before the trial began in this case. She had been arrested the previous weekend for driving under the influence. She had had two previous convictions for DUI and had spent two months in jail in 1985, during which time she was incarcerated with the respondent. She had also been convicted in 1980 for conspiracy to commit the murder of her husband and spent 2½ years in prison.

Boyd testified that shortly after respondent became her cellmate she had told her that her husband had been killed with an ice pick and hit in the head. Boyd testified that respondent changed her story a few weeks later and bragged that the ice pick would never be found; it was in a rock quarry near Vienna or in some graves. She testified over objection that respondent said that she and Dianna Mummy were lovers and that her marriage to the decedent was never consummated. Boyd stated that Julie Atwood was present during this conversation. She testified that respondent had tried to sexually assault her and that she complained to one of the jailers.

Boyd testified that respondent later told her that she was in love with her and that when this was over she and her daughter could come live with her and that she would take care of them. Boyd testified that she then asked respondent if she had killed her husband and that respondent admitted that she had. She also stated that she overheard respondent talking to herself saying, "I killed him, but they'll never find it," but admitted that she was not in the same cell with respondent at this time. Sheriff Faulkner testified that the first time Boyd claimed to have heard respondent confess to the murder was

the night before the trial herein. He testified that he had interviewed her some six months earlier because he knew she and respondent were incarcerated together in 1985, but Boyd did not at that time tell Faulkner that respondent had confessed to her.

After her release from jail, Boyd testified that respondent called her and asked if she and her nephew Greg could come over because she wanted to talk with Boyd. Boyd gave them permission to come over. Respondent told her, Boyd testified, that they had come to move Boyd and her daughter to respondent's home in Alamo, Tennessee, as Boyd had requested. Boyd denied that she had made such a request of respondent. Boyd told respondent, however, that she and Greg could spend the night in spite of the fact that she was so scared of respondent she didn't sleep. Boyd testified that the next day her husband returned and respondent and Greg left.

Boyd admitted that she never told anyone about the confession when it happened before testifying in this proceeding, except for a prison matron named Marita she had seen at a horse sale after her release. The reason she hadn't told anyone before was that she figured no one would believe her. Boyd also admitted that objector's attorney, Gregory Veach, was her attorney in another case. However, she denied that any deals were made in exchange for her testimony in this case.

Respondent testified on her own behalf that she was incarcerated at the same time as Linda Boyd and Julie Atwood in December 1985, but vehemently denied ever telling either woman that she had killed Paul Hook. She denied ever telling them or talking out loud to the effect that "they'll never find it," or where the weapon might be buried. Respondent denied that Linda and Julie were afraid of her and stated that the women wrote letters to her parents for her because respondent couldn't spell very well. She also vehemently denied ever sexually assaulting or attempting to assault either woman. The court sustained objections to questions on cross-examination of whether respondent and Dianna Mummy were lovers or whether she had ever had sexual relations with another female.

Respondent testified that Boyd called her about a year before the trial herein in Alamo, Tennessee, where she was then living and asked for help because she had left her boyfriend and had nowhere to stay except to go back to her husband's house. Respondent and her nephew Greg went to Anna, Illinois, the next day to visit Boyd where she was staying. Respondent, Greg, Boyd, and a friend of Boyd's spent the night on the floor in the same room. She denied making any passes at Boyd that night. She and Greg went home the next day af-

ter Boyd's husband came home. Respondent stated that she could not offer Boyd a place to stay because Boyd could not leave the State after her DUI conviction.

The court denied respondent's motion to strike or dismiss the petitions at the end of objector's case. Respondent's only testimony was her own, although she requested a continuance in order to obtain rebuttal witnesses to the testimony of Linda Boyd. The case was continued until August 21, 1987, to allow respondent to subpoena these witnesses. On August 19, 1987, Carl Hook filed a petition to disqualify respondent as administratrix based on section 2—6 of the Probate Act and asked that his petition be heard and decided with objector's petition. No testimony was taken on August 21, 1987; instead, respondent filed a motion to strike the petition filed by Carl Hook.

Judge Horman died before the close of the evidence in this matter. The case was assigned to Judge Foster, who called the matter for hearing to close the evidence on August 26, 1988. This hearing was continued at respondent's request to December 16, 1988, and at the request of objector to May 26, 1989. At this time the parties had stipulated that the court should consider the transcripts of the hearings conducted by Judge Horman on July 9 and 10, 1987, the objector rested, and respondent asked the court to take judicial notice of the jury verdict of not guilty in respondent's criminal trial in 1988. The court refused to take judicial notice of the verdict in the criminal proceeding because the burden of proof was higher than the burden of proof faced by objector in the instant proceeding. The parties were asked to submit written closing argument in support of their respective cases. On October 13, 1989, Judge Foster ruled that the objector did not meet their burden of proof and denied the petitions.

In the court's post-trial order entered January 24, 1990, it gave a rationale, based on its findings of fact, for its finding on the ultimate issue of law, that objector failed to prove that respondent intentionally and unjustifiably caused the death of Paul Hook:

"Respondent is the only person the authorities were able to place at the Hook home the night Paul Hook was murdered. Respondent's testimony as to what she did that night does leave doubt as to the truth of her statements. It seems hard to believe she would not have made more effort than she said she did between 7:30 p.m. and 2:00 a.m. to find out where Mr. Hook was, even if she did believe he was out with others looking for the bull. This obviously casts suspicion on her. It is understandable why she is the prime suspect. But it is not proof that she intentionally and unjustifiably killed Mr. Hook.

There is really no physical evidence linking respondent to the killing. In fact, Sheriff Faulkner admitted the position of the gas hose ruled her out as the perpetrator. Mrs. Thornton testified that her husband saw a motorcycle at the Hook residence and she saw a person standing in front of the gas tank at 6:50 P.M. Also, when they returned home from church the truck had been moved. There was no follow-up testimony on any of this.

The only other significant evidence the petitioners produced was the opinions of the police officers and the confessions.

The opinions of Officer Geittmann and Sheriff Faulkner are just that—opinions. They are based upon the same evidence that is in the court record. Their opinions are not proof that respondent intentionally and unjustifiably caused Mr. Hook's death.

If I were a police officer, I would probably have the same opinion as these officers. In this case though, these opinions, even if they are considered expert opinions, are not proof. They are opinions that the respondent, the prime suspect, must have done it.

Frances Hook testified that respondent stated, 'I am', (a murderer), in response to a recorded crank telephone call. Respondent's explanation of that statement is that she did feel guilty for not checking sooner about Mr. Hook—that she might have saved him.

It seems hard to believe that if respondent did kill Mr. Hook that she would make such an incriminating statement and yet not slip up or confess at least once in all the other interviews, statements and testimony she gave. The statement she made to Frances Hook can be construed in more than one way. It was an ambiguous utterance and not sufficient to carry petitioner's burden of proof.

Linda Boyd's testimony has no credibility. Disregarding the fact of her conviction and sentence for conspiracy to murder her husband and the fact that she was in the Williamson County Jail for her third DUI when respondent allegedly confessed the crime to her, her credibility was destroyed by her conduct after she was released from the Williamson County Jail.

Ms. Boyd testified she was physically afraid of respondent. Yet, she allowed respondent to visit in her home and even spend the night there (although Ms. Boyd did not sleep at all).

Ms. Boyd said she told a matron named Marita about the respondent's confessions. Apparently neither Marita nor any other law enforcement officer followed up on this. I would think that someone who works in a jail would realize the importance of this information, if it was in fact disclosed.

Ms. Boyd was interviewed by Sheriff Faulkner 6 to 8 months before the trial and did not disclose the confessions respondent had made. She did not tell the truth then.

Instead, Ms. Boyd did not tell the 'truth' until the night before the trial in this case. That was the same night she was arrested in Johnson County for another DUI. Had she not been arrested the night before the trial, this 'truthful' testimony would not have been available.

Ms. Boyd said she did not come forward because with her background no one would believe her. It is not so much her background that leads me not to believe her, but the way in which she finally decided to come forward with her information.

She would have had more credibility if she had come forward in September, 1985, when the confessions were made. Or, at least at the time she was released from the Williamson County Jail. She would have had more credibility if she had disclosed this information to Sheriff Faulkner when he interviewed her. By the time she decided to reveal the confession, the night before the trial while in custody for a DUI, any credibility she had was destroyed.

If the evidence that was presented in this case was also produced at the criminal trial, I can certainly see how the respondent was acquitted. Even under the lesser standard of proof by a preponderance of the evidence, the proof is just not sufficient.

The objections are denied."

■ The first issue objector raises in this appeal regards the standard of appellate review of a judgment in a case where, as here, the trial judge who heard the testimony was not the judge who made the ultimate findings of fact and law. Generally, while a trial court's holding is always subject to review, this court will not disturb a trial court's finding and substitute its own opinion unless the holding of the trial court is manifestly against the weight of the evidence. (*Laroia v. Reuben* (1985), 137 Ill. App. 3d 942, 946, 485 N.E.2d 496, 499.) Manifest weight has been defined as that weight which is clearly evident, clear, plain and indisputable. (*Laroia*, 137 Ill. App. 3d at 946,

485 N.E.2d at 499.) Moreover, unless the evidence overwhelmingly supports an opposite conclusion, we may not overturn a judgment merely because we might disagree with it or might, had we been the trier of fact, have come to a different conclusion. *Laroia*, 137 Ill. App. 3d at 946, 485 N.E.2d at 499.

Objector urges, however, that because the manifest weight of the evidence rule is based upon reasoning that the trier of fact has the superior position to see and hear witnesses and thereby evaluate their credibility (*Schulenburg v. Signatrol, Inc.* (1967), 37 Ill. 2d 352, 356, 226 N.E.2d 624, 626), the standard of appellate review in this case requires an independent examination of the evidence and an independent decision on the facts. Objector contends that because the judge who ultimately entered judgment in this matter was not the judge who heard the evidence, independent appellate review of the trial transcript, fact-finding and evaluation of whether objector met their burden of proof in this case is warranted. We agree that if the evidence before the trial court consists of depositions, transcripts or is documentary in nature, the appellate court is not bound by the trial court's findings and may make an independent decision on the facts. (*Wolverine Insurance Co. v. Jockish* (1980), 83 Ill. App. 3d 411, 413-14, 403 N.E.2d 1290, 1292.) Accordingly, we will make such an examination of the record and decision on the facts we find are proved therein.

■ Objector contends that an independent examination of the record by this court will show that he did sustain his burden of proving by a preponderance of the evidence that respondent intentionally and unjustifiably caused the death of decedent, as required by section 2—6 of the Probate Act. While criminal conduct charged in a civil proceeding need only be proved by a preponderance of the evidence rather than beyond a reasonable doubt (*Sundquist v. Hardware Mutual Fire Insurance Co.* (1939), 371 Ill. 360, 365, 21 N.E.2d 297, 300), the evidence of guilt must be clear and convincing. (*Drezner v. Civil Service Comm'n* (1947), 398 Ill. 219, 227, 75 N.E.2d 303, 309.) Moreover, while the prior probate act required conviction of the murder of another before a person could be barred from inheriting or receiving distribution from the estate of the murdered decedent (see Ill. Rev. Stat. 1973, ch. 3, par. 15a; see also *In re Estate of Buehnemann* (1975), 25 Ill. App. 3d 1003, 324 N.E.2d 97), conviction of first or second degree murder under the present Act is not required, but does furnish a "conclusive presumption" that the person convicted of murder "intentionally and unjustifiably" caused the death of the decedent from whose estate he seeks distribution. We also note that in life in-

surance cases, which were not governed by the predecessor probate act, the courts applied the common law policy that one may not profit by his intentionally committed wrongful act. (See *State Farm Life Insurance Co. v. Smith* (1977), 66 Ill. 2d 591, 363 N.E.2d 785.) In *Smith*, the supreme court held that a life insurance beneficiary who had caused her husband's death could not recover on his policy even though there was no conviction or prosecution for murder, where the evidence supported a finding that the beneficiary was not acting in fear of death or great bodily harm when she shot her husband. *Smith*, 66 Ill. 2d at 605, 363 N.E.2d at 791.

■■ If respondent had been convicted of her husband's murder in 1988, that would have furnished a conclusive presumption that she caused his death intentionally and unjustifiably for purposes of section 2—6 of the Probate Act. In the instant case not only did we not have a conviction of murder but, unlike the situation in the *Smith* case, we also did not have any direct evidence that respondent was in any way involved in Paul Hook's death. While the acquittal in the murder trial cannot serve as evidence that she did *not* cause his death, objector must still prove by a preponderance of the evidence that respondent intentionally and unjustifiably caused her husband's death and that evidence must be clear and convincing. We have closely scrutinized the trial transcript herein and agree with the conclusion of Judge Foster that objector did not meet his burden of proof. We agree that Linda Boyd's testimony was incredible and note that the opinion of the law enforcement witnesses that respondent killed her husband was primarily based on Boyd's testimony that respondent confessed to her in December 1985. Moreover, Officer Geittman based his opinion, which discounted respondent's story that she thought Hook had gone with some men to chase a bull, on statements of others indicating that he hadn't helped to chase the bull before, as well as his age and poor physical health. Respondent adequately explained this discrepancy in her later testimony that he probably went with them to show them where the bull had been sighted before. We also agree with Judge Foster that the so-called "admission" to Frances and Carl Hook that "she was a murderer" was an ambiguous utterance, explained by respondent to be a statement reflecting her emotional guilt. We also note that although respondent was the only person Sheriff Faulkner could place on the Hook property that night, there was testimony from the church witnesses that a green truck and motorcycle were on the property and, as Judge Foster noted, there was no follow-up testimony about this. Also, decedent's shirt pocket was unbuttoned and his wallet in which he always carried a great deal of

cash was missing and never found. Finally, the testimony of decedent's close friends indicated that respondent and her husband seemed happy after their marriage. To summarize, we do not find that respondent's evidence of guilt was clear and convincing and find that objector did not prove by a preponderance of the evidence that respondent intentionally and unjustifiably caused the death of Paul Hook.

Finally, objector claims that the trial court abused its discretion by denying his post-trial motion to reconsider. Because we have affirmed Judge Foster's findings of fact in its order of October 13, 1989, we necessarily find no abuse of discretion in the court's denial of objector's post-trial motion to reconsider on January 24, 1990. Accordingly, the judgment of the circuit court of Johnson County is affirmed.

Affirmed.

CHAPMAN and GOLDENHERSH, JJ., concur.