HERBERT ESKRIDGE, Plaintiff-Appellant and Counterdefendant-Appellant, v. FARMERS NEW WORLD LIFE INSURANCE COMPANY *et al.*, Defendants (Veterans Life Insurance Company *et al.*, Counterplaintiffs and Third-Party Plaintiffs; Estate of Elsie Eskridge *et al.*, Third-Party Defendants-Appellees).

First District (2nd Division)   No. 1—92—2517

Opinion filed August 3, 1993.

Howard Hoffman & Associates, of Chicago, and Bernstein & Rochell, Ltd., of Buffalo Grove (Howard Bernstein, of counsel), for appellant.

Levin & Funkhouser, Ltd. (Vance L. Liebman and Michael S. Pomerantz, of counsel), and Young, Houslinger & Rosen, Ltd. (Jay L. Dolgin, of counsel), both of Chicago, for appellees.

JUSTICE SCARIANO delivered the opinion of the court:

On August 8, 1988, Elsie Eskridge (Elsie) was found dead in the house in Glenwood Park where she had formerly resided with her estranged husband, plaintiff Herbert Eskridge. Elsie owned three life insurance policies and had named plaintiff as the beneficiary of each. The first policy, with a value of $118,000, was issued by Farmers New World Life Insurance Company, one of the defendants herein, on September 23, 1987. Elsie also had a Federal Employees' Group Life Insurance policy, administered by Metropolitan Life Insurance Company (Metropolitan), in the amount of $110,000, as to which policy she made plaintiff the beneficiary on February 18, 1988. Finally, the third policy, in the amount of $100,000, was issued by Veterans Life Insurance Company (Veterans) on April 22, 1988.

On October 22, 1988, plaintiff made a claim with all three insurance companies for the proceeds of the policies. However, Elsie's three children from a previous marriage, Derrick A. Herron, Lotonya M. Herron, and James Herron, Jr. (the children), also filed claims for the proceeds, asserting that plaintiff was not entitled to them for the reason that he intentionally caused Elsie's death. The companies refused to honor any of the claims, and after plaintiff brought suit against them to compel payment, Veterans and Metropolitan interpleaded plaintiff and the children. Thereafter, pursuant to an agreement between all of the parties, all of the companies were dismissed

from the cause upon paying the proceeds of the policies to plaintiff's and the children's attorneys, who then deposited all of the funds in an interest-bearing account subject to further order of court.[1] The cause was then heard by the court sitting without a jury, the sole issue being entitlement to the insurance funds.

The following evidence was adduced at trial. Plaintiff and Elsie, who worked together for the United States Postal Service, were married on September 16, 1986. Their marriage was turbulent throughout, and plaintiff had continued to see another woman during the marriage. Ultimately, in June of 1988, the couple separated, and plaintiff took away Elsie's keys to their Glenwood Park home. Plaintiff eventually took up residence with his girl friend, while Elsie went to live in Chicago with a childhood friend named Helen Harden. The Glenwood Park residence was unoccupied at the time of Elsie's death.

On Saturday, August 6, 1988, Elsie was scheduled to accompany Harden to a picnic, but went instead to the Glenwood Park home,[2] where at some point during that day, neighbors saw her mowing the half-acre lawn of the premises. Harden testified that Elsie called her from the Glenwood Park residence at approximately 5 p.m., informing her that she would be returning to Harden's home later that evening. She never arrived, however, and Harden did not inquire further as it was not unusual for Elsie not to return for a few days.

Sergeant Brian Myers of the Glenwood Park police department testified that he was called to the Glenwood Park home at 7 p.m. on Monday, August 8, 1988, by patrol officers who, after responding to a complaint of a vehicle being parked suspiciously in the driveway, noticed a foul stench emanating from the home. After entering the resi-

---

[1]At the time of trial, the funds on deposit totalled approximately $365,000.

[2]Harden actually testified over plaintiff's objection that her daughter told her that Elsie said that she was going to her home in order to meet plaintiff. This testimony constitutes double hearsay, and while Elsie's statement to Harden's daughter as to where she was going would be admissible under the state of mind hearsay exception (*People v. Silvestri* (1986), 148 Ill. App. 3d 980, 985, 500 N.E.2d 456, 460, *appeal denied* (1987), 113 Ill. 2d 583, 505 N.E.2d 360), no exception to the hearsay rule would allow Harden to testify to what her daughter told her. We may nevertheless reasonably infer from the other evidence presented that Elsie did not go to the picnic with Harden and that she instead went to the Glenwood Park home; therefore, the only portion of Harden's testimony we decline to consider is that Elsie went there with the intention of meeting plaintiff.

dence, where it was extremely hot,[3] Sergeant Myers found the partially decomposed body of Elsie lying on the floor next to a mattress in the upstairs master bedroom. Elsie was naked from the waist down and her shirt was pulled up around her neck. Her feet were near, but not actually touching, the bedroom wall, and a telephone answering machine was found between her legs. Sergeant Myers observed dried blood on her mouth and nose, and a cloth which appeared to be stained with blood lay next to her head. Although there was no evidence of forced entry, clothes had been scattered throughout the room. All of the windows were closed, and the air conditioning was off when Sergeant Myers arrived. Finally, plaintiff's expired driver's license was found on the floor near Elsie's body.

Yuskel Konacki, M.D., an assistant Cook County medical examiner, testified that he performed the autopsy on Elsie and found that she was a middle-aged African-American female, and given the postmortem decomposition of her head and upper chest area, he opined that she had died several days before being found. Dr. Konacki found no evidence that Elsie had been shot, stabbed, strangled, beaten or poisoned; however, he could not rule out homicide as the cause of death. Accordingly, he listed the official cause of death as undetermined.

George Washington, a convicted felon who was a friend of both Elsie and plaintiff, testified that in early 1988, plaintiff told him that he had married Elsie only because she was wealthy, and then described to Washington a scheme by which he would become the beneficiary of his wife's insurance policies and then murder her. Plaintiff also told him that he had obtained a book which described different ways in which a person could commit murder without leaving a trace of the cause of death, one of which was by an injection of a lethal dose of insulin.

In March of 1988, plaintiff told Washington that "everything had been taken care of" and solicited his help in killing Elsie, offering to pay him $40,000 for his services. He suggested two ways in which Washington could murder Elsie; he could either inject her with insulin as per their previous discussion, or he could shoot her in a gang-infested neighborhood, making Elsie appear to be the innocent victim of a gang-related homicide.

---

[3]It was later determined that the temperature in the bedroom on the day Elsie died would have been somewhere between 114 and 119 degrees.

Instead of cooperating with plaintiff, Washington told Elsie about plaintiff's plot. After Elsie confronted him with the information which Washington had given her, plaintiff promised to kill him for "mess-[ing] up his plans." He threatened Washington at his home on several occasions, and Washington claimed that at another time, plaintiff shot out his car windows. After this incident, Washington went to the Maywood police department in order to obtain protection, and while he was there, he also described plaintiff's plan to murder his wife. When Washington read in a newspaper several weeks later that Elsie was dead, he immediately recontacted the Maywood police department and they sent him to the Glenwood police department, where he related his story to Sergeant Myers.

Helen Harden testified that sometime in April, she and Elsie had discussed Elsie's life insurance policies, and after telling Harden that she had designated plaintiff as the beneficiary on all of them, Elsie warned her that "if anything mysterious happens to [me], have them investigate [plaintiff's] ass first." Harden stated that although Elsie did not seem to be afraid at that time, she appeared horrified during a later conversation when she told her that plaintiff threatened to kill her because she had decided to give their dog away after they had moved.

Latonya Herron, one of the children, testified that she lived with Elsie and plaintiff for a short period of time before Elsie's death. She stated that at some point during that period of time, Elsie told her to look for plaintiff if anything happened to her, and when Lotonya asked for clarification, Elsie told her that she would "understand it sooner or later."

Wilbert Beaton, an investigator for the Cook County medical examiner's office, testified that in his expert opinion, it was more likely than not that plaintiff caused Elsie's death for the following reasons: (1) her body was found in a home where she was not currently residing; (2) her body was found semi-clothed under suspicious circumstances; (3) she was estranged from plaintiff, who was living with his long-time girl friend; (4) plaintiff had previously plotted to have her killed; (5) he had previously threatened to kill her; (6) she had recently purchased a substantial amount of life insurance; and (7) plaintiff was the beneficiary on all of those life insurance policies.

The children finally called plaintiff as an adverse witness, and he admitted that he was living with his girl friend at the time of his wife's death; that she, and not Elsie, was the beneficiary of his life insurance policy; and that he took away Elsie's keys and forced her out of their Glenwood Park home. He also testified that he had been

previously suspended from work for kicking a co-employee as well as for threatening one of his supervisors at the post office. He denied, however, that he killed his wife or that he was in her presence on the day that she died.

After his motion for a "directed verdict" was denied,[4] plaintiff called Glenwood Park police sergeant Alexander Dimare, who testified that in August 1991, he reopened the criminal investigation of Elsie's death at the request of Wilbert Beaton. After reviewing the files in the case, however, he was unable to determine how Elsie died; therefore, he subsequently closed the investigation without arresting anyone in connection with the case.

Finally, Chicago police detective Michael Kill testified as an expert witness on plaintiff's behalf. He conducted a follow-up investigation of Elsie's death and confirmed that there was no evidence that she had been shot, stabbed, beaten, strangled or poisoned. Officer Kill further testified that he found Washington to be untrustworthy because of his extensive criminal background, that he found no record of Washington's alleged complaint with the Maywood police department, that he had a motive to lie because he had had a previous dispute with plaintiff over a car which he purchased from him, and that Washington's "reputation for truthfulness [in the community] is minimal." He also determined that plaintiff was at work between 3 and 11 p.m. on August 6, 1988, and while he admitted that it was possible for plaintiff to have left during that time, Officer Kill found no evidence that he did in fact do so. For these reasons, Officer Kill concluded that, in his opinion, Elsie's death was not a homicide.

After hearing all of this evidence, the trial court found in favor of the children, specifically finding that Elsie's death was a homicide and that plaintiff intentionally and unjustifiably caused her death. Plaintiff appeals from that judgment.

■ In a proceeding to determine the respective rights of claimants to property deposited by the stakeholder in an interpleader action, the burden of proof rests with each claimant to establish his entitlement to the property, and in so doing, the claimants must recover on the strength of their own claims, and not on the weakness of the adverse claim. (*Blair v. Travelers Insurance Co.* (1961), 30 Ill.

---

[4]As we have noted in previous opinions, we find no provision in the Code of Civil Procedure which allows a party to bring a motion for a directed verdict or a "directed finding" in a bench trial. See *Rohter v. Passarella* (1993), 246 Ill. App. 3d 860, 864 n.1; *People v. Davilla* (1992), 236 Ill. App. 3d 367, 373 n.3, 603 N.E.2d 666, 669 n.3.

App. 2d 191, 193, 174 N.E.2d 209, 209-10; *Prudential Insurance Co. v. Cahill* (1943), 321 Ill. App. 45, 53, 52 N.E.2d 481, 484; see 7A C. Nichols, Illinois Civil Practice §7460, at 242 (rev. ed. 1991).) In the instant case, the parties stipulated that Elsie was dead and that plaintiff was the named beneficiary on each of her insurance policies. Therefore, plaintiff sustained his burden of establishing a right to the insurance proceeds, and the children bore the burden of establishing a greater right thereto or, as in this case, some affirmative matter defeating plaintiff's claim.

■ Under section 2—6 of the Probate Act of 1975 (section 2—6), a beneficiary is not entitled to the proceeds of a life insurance policy when he or she intentionally and unjustifiably causes the death of the insured. (Ill. Rev. Stat. 1987, ch. 110½, par. 2—6.)[5] In order to prevent a beneficiary from recovering life insurance proceeds under that statute, the challenging party must prove that: (1) the insured is in fact dead; (2) the insured was intentionally and unjustifiably killed; and (3) the beneficiary was the person who intentionally and unjustifiably caused the death of the insured.[6]

In the case at bar, as just noted, the parties stipulated that Elsie was dead; further, plaintiff does not contend that Elsie was killed accidentally or justifiably. He takes issue only with the trial court's de-

---

[5]Section 2—6 states in pertinent part:
   "Person causing death. A person who intentionally and unjustifiably causes the death of another shall not receive any property, benefit, or other interest by reason of the death, whether as heir, legatee, beneficiary, joint tenant, survivor, appointee or in any other capacity and whether the property, benefit, or other interest passes pursuant to any form of title registration, testamentary or nontestamentary instrument, intestacy, renunciation, or any other circumstance. The property, benefit, or other interest shall pass as if the person causing the death died before the decedent ***. A determination under this Section may be made by any court of competent jurisdiction separate and apart from any criminal proceeding arising from the death ***." Ill. Rev. Stat. 1987, ch. 110½, par. 2—6.

[6]We note that while both parties agreed at trial that the children were required to prove the above-stated elements by "clear and convincing" evidence (see *In re Estate of Hook* (1991), 207 Ill. App. 3d 1015, 566 N.E.2d 759, *appeal denied* (1991), 137 Ill. 2d 665, 571 N.E.2d 148), we find the proper burden of proof to be applied when a party seeks to prove in a civil action that a crime was committed is by a preponderance of the evidence. (See *Board of Education of the City of Chicago v. State Board of Education* (1986), 113 Ill. 2d 173, 497 N.E.2d 984.) However, because we hold below that it was not against the manifest weight of the evidence for the trial court to determine that the evidence against defendant was clear and convincing, we conclude, *a fortiori*, that the children presented sufficient evidence to meet the preponderance standard.

termination that Elsie's death was a homicide and that it was he who killed her.

We are not to reverse the trial court's determination that the challenging party met its burden of establishing the elements necessary to preclude a beneficiary from collecting insurance proceeds unless that finding was against the manifest weight of the evidence. (*State Farm Life Insurance Co. v. Smith* (1977), 66 Ill. 2d 591, 595, 363 N.E.2d 785, 786.) A fact finder's determination will be deemed to be against the manifest weight of the evidence only where the opposite conclusion is clearly evident or where the findings are unreasonable, arbitrary and not based on the evidence. (*Maple v. Gustafson* (1992), 151 Ill. 2d 445, 454, 603 N.E.2d 508, 512-13.) Moreover, it is hornbook law that we are not to usurp the function of the fact finder by substituting our judgment on questions of fact which were fairly submitted, tried and determined from the evidence (*Maple*, 151 Ill. 2d at 452-53, 603 N.E.2d at 511-12); therefore, we are without authority to reverse a factual determination unless there is a complete absence of facts in the record supporting the conclusion reached. *Allendorf v. Elgin, Joliet & Eastern Ry. Co.* (1956), 8 Ill. 2d 164, 171, 133 N.E.2d 288, 291; *Laird v. Illinois Central Gulf R.R. Co.* (1991), 208 Ill. App. 3d 51, 64-65, 566 N.E.2d 944, 951.

■■ It is undisputed that the evidence presented by the children on these two issues is completely circumstantial. Circumstantial evidence is the proof of certain facts and circumstances from which the fact finder may infer other connected facts which usually and reasonably follow according to the common experience of mankind. (*People v. Rhodes* (1981), 85 Ill. 2d 241, 248-49, 422 N.E.2d 605, 608.) In civil actions, circumstantial evidence is not limited to instances where the circumstances support only one logical conclusion; instead, the sole limitation on the use of circumstantial evidence is that the inferences drawn therefrom be reasonable. (*Mort v. Walter* (1983), 98 Ill. 2d 391, 396, 457 N.E.2d 18, 21; *Hartness v. Ruzich* (1987), 155 Ill. App. 3d 878, 883, 508 N.E.2d 1071, 1073-74, *appeal denied* (1987), 116 Ill. 2d 555, 515 N.E.2d 108.) Even with respect to criminal convictions based solely on circumstantial evidence, the facts proved need not be inconsistent with any reasonable hypothesis of the defendant's innocence. (*People v. Pintos* (1989), 133 Ill. 2d 286, 291, 549 N.E.2d 344, 346.) With these precepts in mind, we must determine whether it was against the manifest weight of the evidence for the trial court to have inferred from the circumstantial evidence offered by the children that Elsie's death was caused by criminal means and that plaintiff was the one who caused it.

## A

■ We find that there was sufficient circumstantial evidence presented from which the trial court could have reasonably inferred that Elsie did not die of natural causes, but instead was murdered. First, the blood found on Elsie's face and on the rag which was found nearby, as well as the fact that her shirt was pushed up around her neck, are reasonable indications of foul play. Furthermore, plaintiff told Washington that he learned from a book how to kill someone without leaving a trace as to how that person died, a scenario which parallels the facts in the case *sub judice*. Moreover, it was reasonable for the trial court to conclude that Elsie did not die naturally in her sleep while napping because it is extremely unlikely that she would: (1) have lain on the wooden floor instead of the mattress; (2) not have turned on the air conditioning or at least opened a window before lying down to take a nap in a room where the temperature was in excess of 100 degrees; (3) have lain with the answering machine between her legs; and (4) have rolled her blouse up around her neck before going to sleep. Furthermore, it was logical for the trial court to reject plaintiff's suggestion that she died after collapsing from heat exhaustion, since there is no explanation as to how her body came to rest in such an unusual position, how her shirt came to be rolled up around her neck, or how the blood found its way onto her face and the nearby rag. Finally, had Elsie been stricken by some sort of heart attack or hemorrhage, those potential causes of death surely would have been apparent from an autopsy taken only a few days after her demise.

Accordingly, we hold that the trial court's determination that Elsie's death was a homicide was not against the manifest weight of the evidence.

## B

■ We also find that there was ample circumstantial proof from which the trial court could have reasonably inferred that plaintiff was the person who either killed or had someone else kill Elsie. First, plaintiff had a powerful motive to kill her—he was the beneficiary on all of her life insurance policies which she purchased after marrying plaintiff, and on the one policy which she had obtained prior to the marriage, she subsequently named him the beneficiary. Second, the couple had a long history of marital discord during which plaintiff had

an extramarital affair, culminating in his taking up residence with his girl friend. Third, Washington testified that just a few months before Elsie died, plaintiff solicited his assistance in having her killed, promising to share with him the proceeds of Elsie's insurance policies. Fourth, Harden testified that Elsie told her that plaintiff had threatened to kill her. Fifth, prior to her death, Elsie told Harden and her daughter Lotonya that plaintiff should be investigated if she were to die under suspicious circumstances. Finally, there was no evidence of forced entry into the home; therefore, plaintiff, who had keys to the residence, had access to the house without forcibly entering. In light of the substantial amount of circumstantial evidence indicating that plaintiff intentionally and unjustifiably caused the death of Elsie, we hold that the trial court's determination to that effect was not against the manifest weight of the evidence, whether we measure the children's proof at trial by the "clear and convincing" evidence standard or the preponderance of the evidence yardstick.

For all of the foregoing reasons, we affirm the judgment of the trial court.

Affirmed.

McCORMICK, P.J., and DiVITO, J., concur.