178 F.3d 473
 PRUDENTIAL INSURANCE COMPANY OF AMERICA and Boston Mutual
Life Insurance Company, Plaintiffs,
v.
Chrystal ATHMER, a minor, and Geneva Athmer, individually
and as guardian of Chrystal Athmer, Defendants-Appellants,
v.
Steven M. Hill, Jr., a minor, and Betty Jo Pierce,
individually and as guardian for Steven M. Hill,
Jr., Defendants-Appellees.
 No. 98-4043.
 United States Court of Appeals,
Seventh Circuit.
 Argued April 12, 1999.
Decided May 14, 1999.
 
 Richard J. Pautler, Thompson & Coburn, St. Louis, MO, argued, for Plaintiffs.
 Steven E. Katzman, John F. Pawloski (argued), Katzman & Mack, Belleville, IL, for Defendants-Appellants.
 Mary M. Brauer (argued), Cook, Shevlin, Keefe, Ysursa, Brauer & Bartholomew, Belleville, IL; John J. O'Gara, Jr., Belleville, IL, for Defendants-Appellees.
 Before POSNER, Chief Judge, and EASTERBROOK and DIANE P. WOOD, Circuit Judges.
 POSNER, Chief Judge.
 
 
 1
 A pair of insurance companies brought this interpleader action to determine who should receive the proceeds of two life insurance policies owned by a man who was murdered by his wife. The contenders are the victim's natural daughter, and the murderess's natural son and sister. Upon stipulated facts, the district judge rendered judgment for the latter two, and the daughter appeals.
 
 
 2
 Kevin Spann, a soldier in the U.S. Army, was the insured. Prudential had issued him a life insurance policy pursuant to the Servicemen's Group Life Insurance Act of 1965 (SGLI), 38 U.S.C. §§ 1965 et seq., for $200,000 in 1992 when he was stationed in Germany. The policy named Spann's wife, Gina Spann, as primary beneficiary and Gina's natural son, Steven Hill, as contingent or secondary beneficiary. Steven was 13 and had been living with Kevin and Gina throughout the eleven years of their marriage. The other policy, which was for $100,000, had been issued in 1994, also in Germany, by Boston Mutual. This policy also named Gina as primary beneficiary, but it named her sister, Betty Jo Pierce, rather than Steven, as the contingent beneficiary, and it was not issued under SGLI. Neither policy mentioned Chrystal Athmer, Kevin Spann's natural daughter. He had never lived with her or even acknowledged the relationship, which was established by DNA testing after his death. In his will Spann devised his estate to Steven, describing him as "my son."
 
 
 3
 At the time of his death in 1997, Spann was a permanent resident of Illinois but was stationed in Georgia. His wife had him murdered there by her 18-year-old lover and three of his 16-year old pals. She pleaded guilty to the murder and was sentenced to life in prison without parole plus five additional years (as the district judge judiciously put it, "the State of Georgia even tacked an additional five years onto that already lengthy sentence"). She no longer has custody of her son. In fact, as Steven's lawyer explained without contradiction, "the whole family is estranged from her. The sister [Betty Jo Pierce] didn't have anything to do with her. They've been trying to get Kevin away from her for years. Gina is somewhere else." The sister is Steven's legal guardian, and has instituted a proceeding to adopt him; neither was complicit in Kevin Spann's murder. Gina is conceded to be disqualified from taking anything under the life insurance policies. The question is whether Steven and his aunt are also disqualified. The district judge held not.
 
 
 4
 There is an initial issue, not adequately dealt with by the parties or the district judge, concerning choice of law. The insurance policies were issued in Germany to a citizen of Illinois. We assume that Kevin Spann was a citizen of Illinois at the time because he was when he died and because the policies list an Illinois address as his permanent mailing address; on the special rules governing the domicile of members of the armed forces, see Restatement (Second) of Conflicts § 17, comment d and illustration 1 (1971). The beneficiaries named in the life insurance policies, Steven and his aunt, are (and, we assume, were) also citizens of Illinois. But the controversy over entitlement to the proceeds was precipitated by a murder in Georgia.
 
 
 5
 The choice of law issue must be analyzed separately for each policy. The cases say or imply that when a question relating to the interpretation and administration of an insurance policy issued under the authority of the servicemen's insurance statute arises that is not answered by the statute itself, then as with other government contracts, e.g., Boyle v. United Technologies Corp., 487 U.S. 500, 504-05, 108 S.Ct. 2510, 101 L.Ed.2d 442 (1988), the answer is to be supplied by federal common law. Rollins v. Metropolitan Life Ins. Co., 863 F.2d 1346 (7th Cir.1988); Prudential Ins. Co. v. King, 453 F.2d 925, 931 (8th Cir.1971); cf. Ridgway v. Ridgway, 454 U.S. 46, 59-60, 102 S.Ct. 49, 70 L.Ed.2d 39 (1981); Metropolitan Life Ins. Co. v. Christ, 979 F.2d 575 (7th Cir.1992); Prudential Ins. Co. v. Tull, 690 F.2d 848 (4th Cir.1982) (per curiam); but see Emard v. Hughes Aircraft Co., 153 F.3d 949, 959-60 (9th Cir.1998) (dictum). Since the concept of "federal common law" is nebulous when a statute is in the picture, it might be better to jettison the concept in that context and say simply that in filling gaps left by Congress in a federal program the courts seek to effectuate federal policies. Burks v. Lasker, 441 U.S. 471, 476-77, 99 S.Ct. 1831, 60 L.Ed.2d 404 (1979); Ivey v. Harney, 47 F.3d 181, 183-84 (7th Cir.1995). SGLI is a federal program; in fact, technically the government rather than the serviceman is the policyholder. 38 U.S.C. § 1966; Ridgway v. Ridgway, supra, 454 U.S. at 51. The government's concern with beneficiary issues is shown by SGLI's detailed provisions concerning who the beneficiary is if the policy doesn't say, 38 U.S.C. § 1970(a), although the contingency of a beneficiary's murdering the insured is not addressed. As we have both a government contract and a federal statute (we might have the government contract yet only a procedural issue not governed by a statute, or at least by the statute authorizing the contract), the case for using federal law to answer the question of who is to receive the proceeds of the insurance policy is compelling.
 
 
 6
 Often a court asked to fill a gap in a federal statute will do so by borrowing a state's common law, e.g., Atherton v. FDIC, 519 U.S. 213, 224-25, 117 S.Ct. 666, 136 L.Ed.2d 656 (1997), because in most areas of the law state common law is more highly developed than federal. Steffes v. Stepan Co., 144 F.3d 1070, 1074 (7th Cir.1998); Baravati v. Josephthal, Lyon & Ross, 28 F.3d 704, 707 (7th Cir.1994). But borrowing state law would be a mistake in the case of soldiers' life insurance policies. Frequently as in this case the policy is issued wherever the soldier happens to be stationed when thoughts of mortality assail him. Although soldiers generally designate a U.S. state as their domicile, their connection with that state is often tenuous until retirement. It would be arbitrary to subject issues arising under the policy to the law of a particular state. Better that these policies should be governed by a uniform set of rules untethered to any particular jurisdiction. Prudential Ins. Co. v. Tull, supra; Prudential Ins. Co. v. King, supra, 453 F.2d at 931; cf. United States v. Kimbell Foods, Inc., 440 U.S. 715, 728, 99 S.Ct. 1448, 59 L.Ed.2d 711 (1979); Commonwealth Edison Co. v. Vega, 174 F.3d 870 (7th Cir.1999). Congress's desire for uniformity is reflected in the statute's detailed provision mentioned earlier regarding who shall receive the proceeds if a beneficiary is not named.
 
 
 7
 The principle that no person shall be permitted to benefit from the consequences of his or her wrongdoing has long been applied to disqualify murderers from inheriting from their victims, whether the route of inheritance is a will, an intestacy statute, or a life insurance policy. E.g., Mutual Life Ins. Co. v. Armstrong, 117 U.S. 591, 600, 6 S.Ct. 877, 29 L.Ed. 997 (1886); Riggs v. Palmer, 115 N.Y. 506, 22 N.E. 188 (N.Y.1889); Swietlik v. United States, 779 F.2d 1306 (7th Cir.1985); see annotations at 25 A.L.R.4th 787 (1981 & 1998 Supp.), 27 A.L.R.3d 794 (1970 & 1997 Supp.). It is undoubtedly an implicit provision of the Servicemen's Group Life Insurance Act of 1965, Prudential Ins. Co. v. Tull, supra, and it disqualifies Gina Spann from receiving any of the proceeds of Kevin's SGLI policy, even though she is the primary beneficiary named in it.
 
 
 8
 The usual consequence when a primary beneficiary disclaims or is forced to disclaim an interest under an insurance policy, will, pension plan, or other such instrument is that the contingent beneficiary takes in the place of the primary one. And this is the approach that a majority of courts take when the beneficiary is disqualified by reason of having murdered his benefactor. E.g., Lee v. Aylward, 790 S.W.2d 462 (Mo.1990); Spencer v. Floyd, 30 Ark.App. 230, 785 S.W.2d 60 (Ark.App.1990); Seidlitz v. Eames, 753 P.2d 775 (Colo.App.1987); National Home Life Assurance Co. v. Patterson, 746 P.2d 696 (Okl.App.1987). (There is a slew of minority rules, see Annot., 26 A.L.R.2d 987 (1952 & 1998 Supp.); Lee R. Russ & Thomas F. Segalla, Couch on Insurance, § 62:19 (3d ed.1997)--which is a good reason for having a uniform federal rule for SGLI policies.) We take it, although the case law is sparse, that if the contingent beneficiary is himself a wrongdoer and his wrongdoing contributed to the death of his benefactor, as where the contingent beneficiary is the accomplice of the primary beneficiary in the benefactor's murder, the same rule that disqualifies the primary beneficiary disqualifies the contingent beneficiary. In re Estate of Vallerius, 259 Ill.App.3d 350, 196 Ill.Dec. 341, 629 N.E.2d 1185, 1188 (Ill.App.1996). We are surprised that Reynolds v. American-Amicable Life Ins. Co., 591 F.2d 343 (5th Cir.1979) (per curiam), allowed an accessory after the fact to inherit.
 
 
 9
 But this leaves the case in which the primary beneficiary may derive an indirect benefit if the contingent beneficiary (assumed to be completely innocent) is allowed to obtain the benefits. Estate of Vallerius is the plainest illustration: the grandchildren murdered their grandmother, who had left her estate to their (innocent) mother, who died, having devised her estate, now including the grandmother's money, to her children--the murderers. They were, of course, barred from taking under their mother's will. Subtler cases of indirect benefit can be imagined. Suppose that Steven Hill (the murderess's son and victim's stepson) were an adult and he promised that he would use the life insurance proceeds to pay for his mother's lawyer or to buy her books or other goods that the prison would allow her to receive. Or suppose that Steven needed an expensive operation that Kevin could not or would not pay for and Gina killed Kevin so that the proceeds of his life insurance could be used to pay for the operation; or that Gina had been given a short prison sentence and Kevin had promised to support her in style out of the life insurance proceeds when she was released. The lawyer for Steven and Betty Jo argued to us that the fulfillment of such a promise would be barred by the "murdering heir" rule itself, but that is not correct. The rule forbids the murderer to take under the will or other instrument; it does not impress on the benefits a kind of reverse constructive trust placing them forever beyond the murderer's reach.
 
 
 10
 These cases can be multiplied indefinitely. Some states have decided that the best way to deal with them and make utterly certain that the murderer does not profit from his crime is to disqualify all the murderer's relatives, except his or her children if they are also the victim's children. E.g., Ga. Stat. 53-4-64(c); Crawford v. Coleman, 726 S.W.2d 9 (Tex.1987). Under that rule, Steven and Betty Jo would be disqualified. We need not decide whether that is or should be the federal common law rule governing murders by beneficiaries of Servicemen's Group Life Insurance policies, because Chrystal, the daughter, the party who would benefit from such a rule, does not advocate a uniform federal rule. She argues for the rule of the insured's domicile, here Illinois. Steven and Betty Jo argue for a uniform federal rule, not a borrowed state rule--a uniform rule that does not cut out the murderer's bloodline, that instead requires proof that the murderer will in fact benefit if the contingent beneficiary is allowed to take in the murderer's place. We could turn the tables on Steven and Betty Jo and say, yes, we agree with you that a uniform federal rule is desirable, but we don't like your rule; we like the rule that would entitle the natural daughter to a victory in this suit. But we do not reverse judgments in civil cases on the basis of grounds not argued by the appellant at any stage of the litigation--grounds, therefore, that the appellee had no opportunity to meet. See, for the general principle, Cosgrove v. Bartolotta, 150 F.3d 729, 735 (7th Cir.1998), and for its application to murdering-heir cases, Reynolds v. American Amicable Life Ins. Co., supra, 591 F.2d at 344.
 
 
 11
 The life insurance policy issued by Boston Mutual was not issued under the aegis of the Servicemen's Group Life Insurance Act, and so federal common law is not in the picture. The choice of law rule of the forum state, that is, Illinois, must therefore be used to determine which jurisdiction shall supply the rule of decision. Klaxon v. Stentor Electric Mfg. Co., 313 U.S. 487, 61 S.Ct. 1020, 85 L.Ed. 1477 (1941). In the case of life insurance, that rule picks the law of the state where the insured was domiciled when the policy was applied for, hence in this case Illinois, unless some other state has a more significant relationship. That at any rate is the rule of the Second Restatement, see section 192 (and note that comment b to that section confirms Kevin Spann's status as an Illinois domiciliary), which Illinois follows. Ingersoll v. Klein, 46 Ill.2d 42, 262 N.E.2d 593 (Ill.1970); Spinozzi v. ITT Sheraton Corp., 174 F.3d 842, ---- (7th Cir.1999). (Section 192 itself is cited approvingly in Hofeld v. Nationwide Life Ins. Co., 59 Ill.2d 522, 322 N.E.2d 454, 458 (Ill.1975).) But one could argue, consistent with the principle--which is a principle of Illinois law--that the law of the place of the tort is the presumptive or default rule of choice of law in tort cases, Spinozzi v. ITT Sheraton Corp., supra, 1999 WL 177503, at * 2, that the law of Georgia should govern this case instead. For it was a tort, namely the wrongful death that Gina Spann inflicted on her husband, that is the basis for refusing to enforce the contract as written. Georgia has the paramount interest in deciding whether to refuse to enforce a contract as a means of increasing the punishment for a murder committed in Georgia. But just to show how complicated choice of law analysis can be, we point out that arguably what is at stake in "murdering heir" cases is donative intent rather than deterrence. Deterrence of murdering heirs is a legitimate concern, given the number of murders by spouses and children (more than 1,000 in 1997, see FBI, Uniform Crime Reports for the United States 1997 21 (1998) (tab.2.12)), but could be achieved by imposing on the murderer a fine equal to the amount he inherited from his victim. Even so, the victim would not have made the murderer his heir (or the beneficiary of his life insurance policy) had he known what the future held. E.g., Misenheimer v. Misenheimer, 312 N.C. 692, 325 S.E.2d 195, 198 (N.C.1985); State Farm Life Ins. Co. v. Pearce, 234 Cal.App.3d 1685, 286 Cal.Rptr. 267, 273 (Cal.App.1991); but cf. Lee v. Aylward, 790 S.W.2d 462, 463 (Mo.1990). And if this is the important thing it would point us back toward Illinois.
 
 
 12
 Neither side argues for the application of German law. Although that is where the contracts were made, the parties to the contracts had only the most adventitious connection to Germany and it is highly doubtful that they contemplated the application of German law to any dispute under the policy that might arise. Spinozzi v. ITT Sheraton Corp., supra, 1999 WL 177503, at * 3. The choice is thus between Illinois and Georgia.
 
 
 13
 Both states have "slayer statutes," but they are not the same. The Illinois statute forbids the murderer to "receive any property, benefit or other interest by reason of the death [of the murderer's victim], whether as heir, legatee, beneficiary ... or in any other capacity," and provides that if the murderer is disqualified, the property, etc. shall "pass as if the person causing the death died before the decedent." 755 ILCS 5/2-6. Judicial interpretation has established that the statute is applicable to life insurance. State Farm Life Ins. Co. v. Davidson, 144 Ill.App.3d 1049, 99 Ill.Dec. 139, 495 N.E.2d 520 (Ill.App.1986); Eskridge v. Farmers New World Life Ins. Co., 250 Ill.App.3d 603, 190 Ill.Dec. 295, 621 N.E.2d 164, 169 (Ill.App.1993). Georgia has a statute that deals expressly with murder by the beneficiary of a life insurance policy, and provides that in such a case the property goes to the secondary beneficiary if one is named in the policy. Ga.Code Ann. § 33-25-13. So the Illinois statute defines "benefit" broadly enough to encompass cases of indirect benefit such as we posited earlier, while the Georgia statute, read literally, allows no room for such consideration. This creates a tension with Georgia's will statute, which, as noted earlier, absolutely excludes the murderer's family, provided there is no blood relationship between them and the victim.
 
 
 14
 Kevin Spann's daughter pitches her appeal with regard to both policies on cases interpreting the Illinois statute, and since those cases do not carry the day for her, we have no need to delve into Georgia case law, and anyway we cannot find any relevant cases. The daughter relies primarily on a case in which an Illinois court refused to allow the children of a convicted murderess to take under the victim's will. In re Estate of Mueller, 275 Ill.App.3d 128, 211 Ill.Dec. 657, 655 N.E.2d 1040 (Ill.App.1995). As in this case, the victim was the murderess's husband and the children were hers, not his. But Chrystal has missed the real significance of Estate of Mueller. What it shows is that Illinois does not cut off the murderess's bloodline regardless of circumstances. The court thought it important that the murderess had already been released from prison and had custody of one of her children (the other was an adult) and that the marriage had been a sham and the children had not lived with her husband. Id. at 1043, 1046. It was quite likely in these circumstances that the murderess would benefit if her husband's bequest went to the children; indeed, it was almost certain so far as the bequest to the younger child was concerned, since she was living with her murderous mom.
 
 
 15
 Estate of Mueller suggests that Illinois "murdering heir" case law requires the trial court to make a factual determination whether allowing a relative of the murderer to take in the place of the murderer is likely to confer a significant benefit on him. Estate of Vallerius, discussed earlier, is consistent with that approach (see also State Farm Mutual Life Ins. Co. v. Pearce, supra, 286 Cal.Rptr. at 273), and we cannot find any contrary precedent in Illinois. Which is not to say that it is necessarily the best approach. Rejected by many states, see, e.g., Lee v. Aylward, supra, 790 S.W.2d at 463; Neff v. Massachusetts Mutual Life Ins. Co., 158 Ohio St. 45, 107 N.E.2d 100 (Ohio 1952); In re Estate of Benson, 548 So.2d 775, 777 (Fla.App.1989), it requires an inherently speculative judgment about the future and an investigation of family relations quite likely to be of Faulknerian opacity, but it is Illinois's approach and we are bound by it. It is the approach followed by the district judge, and, as should be apparent from the stipulated facts sketched at the outset of this opinion, the conclusion he reached cannot be adjudged clearly erroneous. It is exceedingly unlikely that Gina Spann will ever benefit significantly from the proceeds of her husband's life insurance policies in the hands of her son and her sister.
 
 
 16
 But we do not think the judge was right to place any weight on the tenuousness of Chrystal's claim to any place in her father's affections. The question of indirect benefit to the murderer is the focus of inquiry under Illinois law as we understand it and it is unaffected by the victim's affection for the person who will take under the will or the insurance policy if the named beneficiary is disqualified. Compare Bennett v. Allstate Ins. Co., 317 N.J.Super. 324, 722 A.2d 115, 117-18 (N.J.Super.1998). The "person" could be the state under an escheat statute, so far as anything to do with the policy behind Illinois's murdering-heir rule is concerned. But we do not think the judge's decision would have been different had he ignored the affective dimensions of Chrystal's relationship with her father; his emphasis was quite properly on the remoteness of Gina's prospects for ever deriving any benefit from the life insurance policies.
 
 
 17
 AFFIRMED.